# Court of Appeals.

November 23, 1897.

## PEOPLE v. WILLIAM J. KOERNER.

1. EVIDENCE—NON-EXPERT.

A question, which is not one calling for the opinion of an expert, but relates merely to facts which are within his knowledge, is not obnoxious to the objection that the witness has not been shown to be an expert.

2. SAME.

On a trial for murder where defect of reason is interposed as a defense, witnesses for the prosecution, who examined the defendant immediately after the homicide, and qualify as medical experts and state the grounds of their opinions, may testify that, in their opinion, he was simulating or shamming unconsciousness.

3. SAME—PHYSICIAN.

Where the testimony of a physician is sought to be excluded under the provisions of section 834 of the Civil Code, the burden is upon the party seeking to exclude it to bring the case within its provisions. He must make it appear, not only that the information which he seeks to exclude was acquired by the witness while attending the patient in a professional capacity, but also that it was necessary to enable him to perform some professional act.

4. CRIMINAL LAW—TRIAL—STRIKING OUT EVIDENCE.

Where the defendant consented to the striking out of evidence from the case, he is not in a position to avail himself of an error committed in its admission, or in striking it out and directing the jury to disregard it.

5. SAME—NON-EXPERT.

Upon a question of sanity or insanity, lay witnesses may be examined as to the acts and conduct of the party, and may, upon giving such evidence, be permitted to testify whether such acts or conduct impressed them as rational or irrational.

6. SAME—ORDER OF TRIAL.

The provisions of section 388 of the Criminal Code are a mere formulation of the rules which previously existed in regard to the order of proof in civil and criminal cases; but it is within the discretion of the court to vary those rules. It is within the discretion of the judge to admit testimony bearing upon the original case at a later stage of the trial, and unless such discretion is abused, it constitutes no error.

7. SAME—WITNESS—CREDIBILITY.

The fact that the evidence, given by a witness, is contradictory of that previously given by him and is improbable, is no cause for the reversal of the judgment, especially where the verdict was not dependent upon that evidence alone.

8. SAME—INSANITY.

There is no authority or principle of the law of evidence that will admit proof of insanity or other disease by mere reputation in the family.

9. SAME—CHARGE.

Where all supposed errors, contained in the principal charge, are completely eliminated from the case by the court in charging as requested by the defendant, and the jury is instructed in a manner which prevents any misapprehension by it as to the law controlling the question of insanity, the exceptions to the principal charge will not justify the court in disturbing the judgment.

10. SAME—EVIDENCE—ADMISSION.

A party's acquiescence, to have the effect of an admission, must exhibit some act of voluntary demeanor or conduct. When the claimed acquiescence is in the conduct or in the language of others, it must plainly appear that such language or conduct was fully known and fully understood by the party before any inference can be drawn from his passiveness or silence. The circumstances must not only be such as afford him an opportunity to act or to speak, but also such as will properly or naturally call for some action or reply from men similarly situated.

11. SAME.

When a person is asleep, intoxicated, or deaf, or a foreigner unable to understand the language employed, he cannot be prejudiced by statements made by others in his presence.

**12. SAME.**

If his condition as to consciousness is a matter of dispute, the statement in his presence is incompetent, though the people are entitled to go to the jury on the question whether the defendant was really unconscious or merely shamming.

**13. SAME—HARMFUL ERROR.**

The burden of showing that an error in the admission of incompetent testimony is harmful is not upon the appellant. It rests with the respondent to show that it was harmless and could by no possibility have prejudiced the defendant.

Appeal from a judgment, convicting defendant of murder in the first degree, and from an order denying a motion for a new trial.

Abraham Levy, for appellant.

John D. Lindsay, for respondent.

MARTIN, J.—In October, 1896, the defendant was indicted for the crime of murder in the first degree. He was charged with having willfully, feloniously, and with malice aforethought killed Rose A. Redgate. The action was brought to trial at the February term of the New York court of general sessions in 1897, and evidence was given showing that on the afternoon of the 23d day of September, 1896, the decedent was shot by a pistol in the hands of the defendant, which resulted in her death upon the same day. The shooting took place on Seventh avenue, between Thirteenth and Fourteenth streets, in the city of New York. That the decedent was shot by a pistol in the hands of the defendant is not denied. But he insists—First, that the shooting was accidental; that his purpose was to commit suicide, which he attempted, by placing the pistol to his head, when to prevent it the decedent grasped the pistol, and it was accidentally discharged, causing the injury which resulted in her death; and, second, that when the homicide occurred he was laboring under such a defect of reason as not to know the nature and quality of his act, or that it was wrong.

On the trial evidence was introduced upon the part of the prosecution tending to show that the defendant, with premeditation and deliberation, willfully and intentionally shot and killed the dece-

dent; that he shot her three times, and that two of the wounds inflicted were of a fatal character; that the relations which had previously existed between the defendant and decedent were of an affectionate nature; that the defendant had solicited her hand in marriage and an engagement had existed between them; that her parents were opposed to her marrying him upon the grounds of his former dissipation and generally bad habits; that a difficulty, or at least a disagreement, had arisen between the defendant and her father by reason of such opposition, and that the defendant, in substance, told him if he did not marry the decedent no one else should. Without attempting to state the evidence in detail, it may be said generally that it tended to establish the defendant's guilt of the crime charged, and was sufficient to justify the court in submitting that question to the jury and to uphold its verdict.

The evidence introduced on the part of the defendant as to the manner in which the homicide occurred was perhaps sufficient to have justified the jury in finding that he did not intend to kill the decedent. The proof as to just what occurred at the time was not very definite or clear. Still, the fact that the pistol was in the defendant's hands, and in his alone, coupled with the fact that there were three shots fired from the defendant towards the decedent, tended to show that he intentionally shot and killed her.

Upon the issue of the defendant's irresponsibility a great amount of evidence was given. That of the witnesses called on his behalf tended to show that several members of his family, on the side of his father and of his mother as well, had been insane; that he was seriously injured when a boy; that he had scarlet fever, and was subject to fits, which rendered him unconscious during their continuance; and that his acts for years previous to the homicide had, at times, been of an irrational character, and such as to indicate that, at those times, he was laboring under a defect of reason. On the other hand, evidence was introduced by the people to show that no such defect of reason existed at the time of the tragedy, and that the defendant was responsible for his act. It must, however, be admitted that the evidence was such as to involve the question of his responsibility in some doubt. But, in view of all the evidence, it was clearly a question of fact to be

determined by the jury. The defendant, however, contends that as the question of his mental capacity was involved in uncertainty, and one upon which there was a sharp conflict in the evidence, the various rulings of the court should be carefully examined, and if any errors were committed a new trial should be granted upon the ground that the question was doubtful, and hence it cannot be said that any improper evidence received, or proper evidence rejected, could not by any possibility have been harmful to him. To some extent, at least, this contention is correct. Therefore it becomes necessary to examine the various exceptions of the defendant, and determine whether any of them were valid, and, if so, whether they can be said to have been harmless, and, consequently, should be disregarded.

The first exceptions to which attention is called in the brief of the learned counsel for the defendant relate to the admissibility of the evidence of the witnesses Brown, Harrison, and Donovan. His first contention is that the court erred in admitting the evidence of the witness Brown as to the treatment of the defendant while in the hospital on the day of the homicide. The witness was first asked: " Did you give quinine for chills? During the seven years you have been there in the Tombs do you know whether or not you gave quinine for chills?" This was objected to. The court then asked the defendant's counsel if he desired to examine the witness to ascertain if he was enough of an expert to answer the question. He replied in the negative, and the court then overruled the objection. The defendant's counsel then stated his objections to the question, which were that the evidence was immaterial, irrelevant, and incompetent, and that the witness had not been shown to be an expert and was not qualified to state. The question was then repeated, and the answer was that, as a rule, it was done, and that in the defendant's case it was kept up for three days. He also testified that during that time they gave him whisky as well as quinine. That this evidence was admissible, if the witness was qualified, is hardly denied. It may be conceded that the rule is that before a witness may be examined as an expert he must be shown to be qualified, and still this ruling be upheld. These questions, when examined, disclose that they did not call for any opinion of the witness as an expert, but sim-

ply for what was done upon that occasion, and incidentally for the usual practice in that hospital. When thus understood, we think it clear that the court committed no error in admitting this proof. The question was not one calling for the opinion of an expert, but related merely to facts which were within his knowledge.

The next question is in regard to the evidence of Dr. Donovan. He was asked whether, when he saw him on the day or evening after the homicide, the defendant was simulating a fit. This evidence was objected to on the ground that it was immaterial, irrelevant, and incompetent, and that the competency of the wit-. ness as an expert had not been established. The court then stated to the counsel for the defendant that, if he desired, he might examine the witness to ascertain whether or not he was a qualified expert. That right was, however, reserved until the cross-examination of the witness. He was then permitted to answer the question, and testified that he thought he was "shamming." He also testified that he was a graduate of the Bellevue Hospital Medical College; that he was graduated in March, 1886; that since that time he had practiced medicine; and that he was a regularly licensed physician. He then stated the grounds upon which his answer was based, which, among others, were that the defendant's respiration and pulse were normal; that everything about him appeared to be normal; and the witness gave his reasons in full for believing that the defendant was "shamming," and had no fit at the time. We think this evidence was clearly admissible, and that the court committed no error in its ruling upon that subject.

The next and last question under the exceptions to which we have referred arises as to the admission of the evidence of Dr. Harrison. He was a witness for the prosecution, and was asked whether, in his opinion, the defendant was "faking." This was objected to as immaterial, irrelevant, and incompetent, and also upon the ground that there had been no proper foundation laid. The objection was sustained. The witness then testified that he made an examination of the defendant, and was able to form an opinion as to his condition. He was then asked what his condition was, which was objected to by the defendant as immaterial,

irrelevant, and incompetent, and that no proper foundation had been laid. The court then asked the defendant's counsel if he desired to cross-examine the witness in relation to his qualifications as an expert, and he was cross-examined. He testified that he graduated from a medical school in 1895; that he was licensed to practice; had graduated as a doctor of medicine; had seen persons in epileptic fits, while under epileptic spasms, and while under epileptic aura. Thereupon the court overruled the objections, and the witness testified that the man's condition presented nothing abnormal, except his apparent unconsciousness; that his pulse was normal; his respiration was normal; that the pupils of his eyes were normal; that his color was normal; and that, in his opinion, he was shamming unconsciousness. We think this evidence was plainly admissible.

On the trial Dr. Ward was sworn as a witness for the prosecution. He was the physician in attendance upon the defendant while in the Tombs, had treated and prescribed for him, and had occupied that relation up to the day before his evidence was given. He testified that after the conclusion of that relation he saw the defendant, asked him how he was getting along with his trial, and other similar questions; that he then said to him he had a letter, asked him to look at the envelope, and open and read it, and told him that he wanted to ask him something about it; that the defendant took the letter, appeared to read it twice, when the doctor asked him who wrote it, and he replied, "Rosa Redgate;" that he asked the defendant if the contents of the letter were true, to which he replied, "Yes; she wouldn't write anything that is not true; but she must have been influenced to write that by some of my enemies." This witness was also permitted to testify that while in court the defendant appeared to be in a sort of "dopy" condition, while in the Tombs he seemed to be bright, and comprehend everything around there, and looked bright and all right. This evidence was objected to by the defendant. The objection was overruled, and he duly excepted. He now contends that the evidence was prohibited by section 834 of the Code of Civil Procedure. That section provides: "A person duly authorized to practice physic or surgery, shall not be allowed to disclose any information which he acquired in attending a patient, in a

professional capacity, and which was necessary to enable him to act in that capacity." The testimony of this witness was to the effect that his knowledge of the facts to which he testified was not acquired while attending the defendant in his professional capacity, and, besides, that he told the defendant that he was not at that time acting as his physician. It becomes quite manifest, from an examination of the record, that the knowledge of the witness of the matters to which his testimony related was not acquired while attending the defendant in a professional capacity, that it was not necessary to enable him to act in that capacity, and that the defendant well understood that he was not talking with him as a physician, but as an individual only. The most important part of the evidence of this witness related to a letter written by the decedent, which was read by the defendant, and to his statements in regard to it. We are of the opinion that this evidence was properly admitted, and that the defendant's exceptions were invalid. People v. Schuyler, 106 N. Y. 298, 12 N. E. 783; People v. Hoch, 150 N. Y. 291, 303, 44 N. E. 976. Where the testimony of a physician is sought to be excluded under the provisions of that section of the Code, the burden is upon the party seeking to exclude it to bring the case within its provisions. He must make it appear, not only that the information which he seeks to exclude was acquired by the witness while attending the patient in a professional capacity, but also that it was necessary to enable him to perform some professional act. Edington v. Insurance Co. 77 N. Y. 564; People v. Schuyler, supra; Fisher v. Fisher, 129 N. Y. 654, 29 N. E. 951.

Near the close of the evidence, however, and when the prosecution rested for a second time, the court said: "I desire to strike from the minutes, or from the record, the whole of the testimony given by Dr. Ward, and I desire to instruct the jury that, in the consideration of this case, they are to pay no attention to the testimony given by Dr. Ward; and I ask you, gentlemen, to remove from your mind any impression his testimony may have made. Now, Mr. Levy, I presume, will make his formal motion. Mr. Levy: I think I had better defer that until I see whether there will be anything in the way of surrebuttal testimony. The Court: We will wait for you, then. You may consider it a few

minutes." The defendant then rested. Whether we are to regard this as a positive act by the court striking out the evidence, or whether it was a suggestion to the defendant's counsel that upon a formal motion it would be stricken out, is not quite clear. But, as the defendant contends that the evidence was stricken out, we shall assume that to be the case, and dispose of the question accordingly. We find in the record no objection or exception to the action of the court in that respect. As the greater portion of the evidence was objected to by the defendant, and as the record discloses no objection to its being stricken out, we think it must be assumed that the defendant consented, and, consequently, if any error was committed in its admission, or in striking it out and directing the jury to disregard it, the defendant is not in a position to avail himself of it. People v. Wilson, 141 N. Y. 185, 189, 36 N. E. 230; People v. Schooley, 149 N. Y. 99, 103, 43 N. E. 536. Moreover, we think it is quite obvious that the substantial rights of the defendant could not have been affected by eliminating that testimony from the case and directing the jury to disregard it.

The next rulings criticised are those of admitting an affidavit made by the defendant on the 7th day of November, 1895, which was, in substance, an information against a bartender for selling strong and spirituous liquors on the 5th day of that month, and in admitting his testimony given as a witness upon three separate trials which took place between the 11th of December of the same year and the 13th of July, 1896. This evidence was admitted for the express purpose of proving the acts of the defendant to rebut the evidence relied upon by him to show that he was irrational when the homicide occurred. After that proof had been admitted, the witness House was permitted to testify that the testimony and acts of the defendant on those occasions impressed him as rational. It is an established rule of evidence in this state that, upon a question of sanity or insanity, lay witnesses may be examined as to the acts and conduct of the party, and that upon giving such evidence they may be permitted to testify whether such acts or conduct impressed them as rational or irrational. We think this evidence was within the rule thus established. The testimony to the effect that the defendant was engaged in procuring the enforcement of the excise law, that he made complaints, was examined as a wit-

ness, and his acts in connection therewith, were some evidence bearing upon the question of his mental integrity, and if they impressed the witness observing them as rational, the prosecution was entitled to the benefit of that proof, and we think the court properly admitted it.

On the trial, after the defendant had rested, the prosecution was permitted to introduce the evidence of two witnesses as to the transaction which resulted in the death of the deceased. It must be conceded that the evidence might more properly have been produced by the prosecution and made a part of its evidence in chief. The contention of the appellant is that the court had no right to admit this evidence after the defendant had rested, and that it constituted an error for which the judgment should be reversed. As sustaining that contention, he relies upon section 388 of the Code of Criminal Procedure. That section provides: "The jury having been impaneled and sworn, the trial must proceed in the following order: (1) The district attorney or other counsel for the people, must open the case, and offer the evidence in support of the indictment; (2) the defendant or his counsel may then open his defense, and offer his evidence in support thereof; (3) the parties may then, respectively, offer rebutting testimony, but the court, for good reason, in furtherance of justice, may permit them to offer evidence upon their original case." The appellant argues that, as a matter of law, the prosecution had no right to introduce this evidence, and that the court possessed no authority to admit it, unless it was affirmatively shown that there was some good reason, in the furtherance of justice, why the evidence should have been admitted at that time. The provisions of section 388 are a mere formulation of the rules which previously existed in regard to the order of proof in civil and criminal cases. But it has always been regarded as within the discretion of the court to vary those rules. That in this case the learned judge was authorized to exercise his discretion upon the question whether the evidence of these witnesses should be admitted at that stage of the trial there is no doubt, and unless his discretion was abused it constitutes no error. Leighton v. People, 88 N. Y. 117. In the case cited it was held that upon the trial of a criminal action it is in the discretion of the court to allow the prosecution to give

evidence in aid of the case already made, after the defense has rested, although the evidence is in contradiction of matter sworn to by the prisoner. While it may be properly said that if the testimony of those witnesses was known and understood by the district attorney when he rested he should have called them as witnesses before that time, yet it was discretionary with the court to permit their testimony afterwards, and we find nothing in the record sufficient to justify this court in holding that there was an abuse of that discretion. Consequently the judgment should not be disturbed on account of that ruling.

The next ground upon which the defendant claims that the judgment should be reversed is that, as the evidence given by the witness Fowler was contradictory of that previously given by him, and was improbable, it should have been disregarded by the jury, and therefore this court should reverse the judgment and grant a new trial. The credibility of this witness, and the effect which was to be given to his evidence, were clearly for the jury to determine. This principle seems to have been recognized by the defendant, as, at his request, the court expressly charged that, if any of the witnesses had willfully testified falsely, the jury had a right to disregard such testimony, even though it was not contradicted or impeached. Moreover, how much effect may have been given to that evidence is in no way disclosed. It may have been entirely disregarded, and still the jury have found the defendant guilty of the crime charged. As the verdict was not dependent upon that evidence alone, it is not within the province of this court to reverse the judgment upon the ground that it was not entitled to credit.

The next ground of error alleged is that the court erred in striking out the evidence touching the insanity of Julia Barth and her incarceration in an insane asylum. The defendant's father was called as a witness, and testified, without objection, that Mrs Barth, a great-aunt of the defendant, was insane, confined in the West Pennsylvania Hospital as an insane person for the period of six months in 1872, and that she was at the time of the trial being cared for at home by her daughter. Upon cross-examination it appeared that the only knowledge the witness had of the subject he received from information given him by her children and

husband. The court, upon ascertaining that the witness had no personal knowledge of the facts as to which he testified, struck out his testimony, upon the ground that it was not the best evidence, but mere hearsay, and the defendant duly excepted. The appellant now contends that the fact that Mrs. Barth was insane could be properly proved by showing that it was a matter of common reputation in her family, and invokes the rule which is sometimes applied when a question of pedigree is involved. We think that the rule has no application here. While the term "pedigree," as usually employed in the rule of evidence relating to that subject, embraces birth, marriage, and death, and the times when these events occurred, still even in those cases the rule relating to the admission of hearsay evidence is restricted to the declarations of deceased persons who are related by blood or marriage to the person, and therefore interested in the question. But it is to be observed that this rule applies only to the declarations of deceased persons, and is based principally upon the fact that it is the best evidence that can be then obtained, and if not admitted the facts could not, by any possibility, be established. No such condition existed here. Mrs. Barth was still living, as were the persons who informed the witness of the matters to which his testimony related. It is obvious, therefore, that this evidence was inadmissible, as it was not the best evidence and could not be established by mere reputation. Moreover, we are not aware of any authority or principle of the law of evidence that would admit proof of insanity or other disease by mere reputation in the family. We are of the opinion that this evidence was improper, and that the court was justified in striking it from the record.

Another ground upon which the defendant seeks a reversal is based upon alleged errors in the charge of the trial judge. The portion of the charge to which he claims to have excepted, and which he now contends was erroneous, was as follows: "The defendant interposes the defense of insanity for the purpose of relieving himself from the position which he now occupies. He does not claim that he is now insane, but he does claim that at the time he committed the homicide he was insane. This is an affirmative defense, and one which the law requires should be established by evidence satisfactory to the jury. * * * Another provision

of the statute is that a person is presumed to be responsible for his acts, and the burden of proof is upon the accused person, except as otherwise prescribed; so that we start in this case with a presumption that the defendant, at the time he perpetrated the act which resulted in the death of the woman, was legally responsible for his acts, and the burden of establishing his irresponsibility rests upon him to a certain extent." The portions of the charge quoted are but a small part of the instructions of the court to the jury. While it may be that, if taken alone, they might be construed as incorrectly stating the law in regard to the burden of proof where the defense is insanity, still, when taken in connection with the whole charge, we think the jury was correctly instructed upon that question. Moreover, after the court had finished its principal charge, and the defendant, as he claims, had excepted to the portions already referred to, he made numerous requests, among which were the following: "I ask your honor to charge the jury that, upon the trial for murder, where the defense interposed is the insanity of the defendant, he is entitled to the benefit of every reasonable doubt resting upon the question of his sanity; that, upon the trial for murder, where the defense interposed is the insanity of the defendant, the people must establish the sanity of the defendant beyond a reasonable doubt; that if the jury cannot say, beyond a reasonable doubt, that the defendant was sane at the time of the commission of the act, and cannot say whether, at that time, he was sane or insane, the defendant must be acquitted; that the defense of insanity need not be proven beyond a reasonable doubt; that the jury, in considering this case, are bound to act upon the presumption that the accused—the defendant—is innocent, and should endeavor, if possible, to reconcile all the circumstances of the case with that of innocence; that the burden of proof rests with the people in this case from the beginning to the end of the trial, and the people are bound to prove that the defendant committed the crime charged in the indictment, and that, at the time of its commission, he was in such a condition of mind as to be responsible for his acts, and all of which must be proved beyond a reasonable doubt, and if this is not so proved the defendant is entitled to be acquitted; that the jury must be satisfied beyond a reasonable doubt, from the evidence of the case, of

the sanity of the defendant at the time of the commission of the act charged in the indictment, and, if the people fail to establish the sanity of the defendant at the time of the commission of the act charged in the indictment, he cannot be convicted of any crime, and is entitled to an acquittal; that the people must satisfy the jury beyond all reasonable doubt that, at the moment the act alleged in the indictment was committed by the prisoner, the defendant had reason, perception and understanding sufficient to enable him to discern right from wrong, and that if he had not, it is the duty of the jury to acquit him; and that it is the duty of the people to satisfy the jury beyond all reasonable doubt that, at the moment the act alleged in the indictment was committed by the prisoner, he had reason, perception, and understanding sufficient to enable him to discern right from wrong, with respect to that particular act, and, if he did not, the jury must acquit; that, if the jury entertain a reasonable doubt, from the evidence of the case, as to the sanity or insanity of the defendant at the time of the commission of the act charged in the indictment, he is entitled to the benefit of that doubt, and must be acquitted; that, if the jury believe that the defendant did not suffer from any mental aberration which would absolve him from punishment for the act charged in the indictment prior to the commission of the act or subsequent thereto, but that such state of mental aberration did exist at the moment when the act occurred which the defendant stands charged with, he cannot be convicted of the crime charged in the indictment, or any other crime, and must be acquitted." All these requests were charged by the learned trial judge. While we are of the opinion that the court in its principal charge, when read together, correctly stated the principles of law which relate to the defense of insanity, yet, when we consider the defendant's requests which were charged by the court, it becomes a certainty that the jury was correctly instructed as to the law. Any supposed error contained in the principal charge was completely eliminated from the case by the court in charging as requested by the defendant, and the jury was instructed in a manner which prevented any misapprehension by it as to the law controlling that question. Therefore we find nothing in the exceptions to the charge which would justify us in disturbing the judgment in this case.

The only remaining ground upon which the defendant insists that a new trial should be granted is the error of the court in permitting Dr. Harrison to testify to a conversation he had with the police officer in the presence of the defendant while he was apparently unconscious, in which he was charged with "shamming." This witness was called by the prosecution, and asked what he (the defendant) was suffering from, if anything; to which he replied: "So far as I could tell, he was not suffering from anything. I simply made a superficial examination, and found that he presented nothing abnormal, except that he was apparently unconscious." Then followed this question: "Did you have any conversation with anybody in his presence and hearing outside of that drug store?" He answered, "I did." Q. With whom? A. The officer. Q. What did you say to him?" This was objected to by the defendant upon the ground that it was immaterial, irrelevant, and incompetent, and that it was not shown that he was in a condition or position to understand or hear what was said in his presence, and upon the further ground that it had not been shown that he was in a condition to understand or know or hear what was said. These objections were overruled, and the defendant excepted. The witness then testified that he said to the officer that he "didn't see there was very much the matter" with the man; that he was probably "faking;" and that he might be taken to the precinct. That this evidence was incompetent and improper, being mere hearsay, or the statement of the witness to a third person, unless made under such circumstances as to be binding upon the defendant, is quite manifest. The only ground upon which it is or can be properly claimed that this evidence was admissible is that the silence of the defendant amounted to an acquiescence in the statement made by the witness, and was therefore binding upon him. That, under some circumstances, admissions by a party may be implied from his acquiescence in the statement of others, is an established principle of the law of evidence. A party's acquiescence, to have the effect of an admission, must exhibit some act of voluntary demeanor or conduct. When the claimed acquiescence is in the conduct or in the language of others, it must plainly appear that such conduct or language was fully known and fully understood by the party

before any inference can be drawn from his passiveness or silence. Moreover, the circumstances must not only be such as afforded him an opportunity to act or to speak, but also such as would properly or naturally call for some action or reply from men similarly situated. Declarations or statements made in the presence of a party are received in evidence, not as evidence in themselves, but to ascertain what reply the party to be affected makes to them. If he is silent when he ought to have denied, the presumption of acquiescence arises. But it is clearly otherwise when his silence is of a character which does not justify such an inference. Thus, when a person is asleep, or intoxicated, or deaf, or a foreigner unable to understand the language employed, he cannot be prejudiced by statements made by others in his presence. Nor is such silence an assent, unless the statements were such as to properly call for a response.

The rule in regard to admissions inferred from acquiescence in the verbal statements of others is to be applied with careful discrimination. As was said by Best, C. J., in Child v. Grace, 2 Car. & P. 193: "Really, it is most dangerous evidence." It should always be received with caution, and ought not to be admitted unless the evidence is of direct declarations of a kind which naturally calls for contradiction, or some assertion made to a party with respect to his rights, in which, by silence, he acquiesces. A distinction is recognized between declarations made by a party interested and those made by a stranger, it having been held that while what one party declares to the other without contradiction is admissible, what is said by a third person may not be. Greenl. Ev. §§ 197, 199; Whart. Ev. § 1136 et seq.; Moore v. Smith, 14 Serg. & R. 393; Child v. Grace, 2 Car. & P., 193; La Bau v. Vanderbilt, 3 Redf. 384, 395; Gibney v. Marchay, 34 N. Y. 301, 305; Lanergan v. People, 39 N. Y. 39; People v. Holfelder, 5 N. Y. Cr. R. 179; People v. Willett, 92 N. Y. 29; Tallcott v. Harris, 93 N. Y. 567; Learned v. Tillotson, 97 N. Y. 1; Bank v. Delafield, 126 N. Y. 410, 418, 27 N. E. 797; Thomas v. Gage, 141 N. Y. 506, 36 N. E. 385.

As witnesses were called who testified that in their opinion the defendant was "faking" or "shamming," the ruling may be upheld upon the ground that the court was justified in holding that

the defendant must have understood what was said, if the statement was one naturally calling for some action or reply on his part.   A more serious difficulty, however, arises when we consider whether, even if the defendant understood what the witness said, there was any presumption of acquiescence to be drawn from his silence.   Were the circumstances such as not only afforded the defendant an opportunity to act or speak, but were they also such as would properly and naturally call for some action or reply from persons similarly situated?   If not, then clearly the evidence was improper.   The statement of the witness was to the effect that the defendant was feigning unconsciousness.   Under the circumstances, was a reply to that statement naturally to be expected ?   If he was unconscious, none could have been made.   If he was not, but was feigning unconsciousness, naturally neither he nor any other person similarly situated would have replied.   It is impossible upon any theory to justify this ruling.   We think it was error, and the only remaining question is whether it was such an error as to require a reversal.

This evidence, if believed, was important, and weighed heavily against the defendant.   It was introduced on the theory that it was a tacit admission upon his part that he was feigning unconsciousness.   If the jury understood that he practically admitted he was not unconscious, but was simulating it, it bore with great force upon the question of premeditation and deliberation.   It is not improbable that the jury may have so regarded it, and drawn inferences therefrom which were highly prejudicial to the defendant.   But it is said that the fact that he was not unconscious was proved by the opinions of witness, and consequently, this evidence is harmless.   Possibly so.   But this court cannot say that it was not relied upon by the jury as potent proof of the defendant's guilt.   It may be it believed that he tacitly admitted he was feigning unconsciousness, and it was but a part of a premeditated plan which involved the homicide and his escape from punishment by that means, and consequently was prejudicial to him.

Dr. Harrison, as an expert, testified that in his opinion the defendant was feigning unconsciousness.   In determining the weight to be given to this evidence, its credibility and competency were involved.   In the absence of proof of his declaration to the officer,

the jury might have believed that this testimony was induced by a desire to aid the prosecution, or was affected by a prejudice engendered by the defendant's claim that he was not a qualified ex-expert. These views, if entertained, would have materially affected his credibility, and his evidence might have been disregarded. But proof that, before his ability was questioned or his interest was enlisted, he had made a statement that was in keeping with his testimony, may have been regarded by the jury as a corroboration of his evidence. That this evidence may have had some effect upon the determination of the jury is not impossible. The burden of showing that it was harmful is not upon the appellant. It rests with the respondent to show that it was harmless, and could by no possibility have prejudiced the defendant. Green v. White, 37 N. Y. 405, 407 ; Stokes v. People, 53 N. Y. 164, 183 ; People v. Greenwall, 108 N. Y. 296, 303, 15 N. E. 404. In the Green Case, Hunt, J., said : It is not for the defendant to show how or to what extent he was prejudiced. The existence of the error establishes his claim to relief. If the plaintiffs wish to sustain the verdict, it is for them to show that the error did not and could not have affected it." In the Stokes Case, Rapallo, J., said : "But it is claimed that the error may be overlooked on the ground that the prisoner was not prejudiced thereby, and cases are cited which decide that where it appears to the appellate court that error has been committed, yet that the error could not possibly have prejudiced the party complaining, it will not be made a ground of reversal either in civil or criminal cases. In all these cases it will be found that that the court has been exceedingly careful so to limit this rule as to render it applicable only where by no possibility could the error have produced injury, and even this was an innovation upon ancient rules, under which it was a matter of course to reverse when error appeared, without inquiring into its materiality." See, also, People v. Corey, 148 N. Y. 476, 494, 42 N. E. 1066 ; People v. Strait, 154 N. Y. 165, 171, 47 N. E. 1090. Applying to this question the doctrine of the cases cited, it becomes obvious that this court cannot properly hold that the error in admitting that evidence was merely technical, and that it could by no possibility have been harmful to the defendant. In the language of Judge Earl : " A person on trial for his life is

entitled to all the advantages which the laws give him, and among them is the right to have his case submitted to an impartial jury upon competent evidence." People v. Greenwall, 108 N. Y. 296, 303, 15 N. E. 404.

We cannot fail to observe the many needless questions that are presented to this court, apparently through the overzeal of those acting in the capacity of public prosecutors, which might have been easily avoided by a more careful preparation and trial. In the hurry and confusion attending such a trial the court should not be expected to always correctly determine every embarrassing question that the ingenuity of opposing counsel can present. A public prosecutor is a public officer, whose duty requires only that he shall fairly present to the court and jury the question involved in his case. When he goes beyond, and by captious objection or ill-considered offer imposes upon the trial court unnecessary burdens, that an adverse result may ultimately follow may well be expected. For the error already pointed out the judgment appealed from must be reversed, and a new trial granted, judgment of reversal to be entered, certified, and remitted pursuant to the provisions of sections 547 and 548 of the Code of Criminal Procedure.

BARTLETT, J.—I agree with Judge Martin, and am also of opinion that, for the following additional reasons, there was reversible error in allowing Dr. Harrison to testify to a conversation he had with a police officer in the presence of the defendant when the latter was lying on the sidewalk, shortly after the shooting, and it was a disputed question of fact whether he was unconscious or shamming unconsciousness. This very important question was for the jury to determine. If they decided that the defendant was shamming, the fact so established bore with terrible force against him, and tended to show that he did know the quality of his act, and that it was wrong. It was a fact that tended to shatter the foundations upon which his principal defense rested. It was, of course, competent for the people to put Dr. Harrison on the stand at the trial, and prove by him, if they could, that defendant was shamming, in his opinion, on the occasion in question. The defendant could then meet this evidence by such proofs as he might.

have, and the jury would take the question to their consultation room with the other issues in the case. This was not the actual course of the trial. Dr. Harrison was not asked to give his opinion upon a disputed question of fact which was to be submitted to the jury. He was asked to state what he said to a police officer in the presence of the defendant immediately after the shooting, and defendant's counsel objected that "it is not shown that the defendant was in condition or position to understand or hear what was said in his presence." Then followed this question by the court: " Q. Was it in the presence of defendant, doctor? A. Yes, sir. The Court: Then I will allow it." What, then, was the situation? The court practically held that the defandant was conscious, and the evidence was competent, for it would shock the sense of justice if a defendant was to be prejudiced by his failure to reply to a statement made in his presence, if at the time, although physically present, he could not hear and understand. The result of this ruling was that the court determined a disputed question of fact and took it from the jury. There is only one safe rule in a case of this kind, and it is well settled by this court, viz.: Statements in the present of the defendant are only competent when he is in a position to hear and understand. McKee v. People, 36 N. Y. 113, 116 ; Lanergan v. People, 39 id. 39, 41. If his condition is a matter of dispute, the statement in his presence is incompetent, although the people are entitled to go to the jury on the question whether defendant was really unconscious or merely shamming.

HAIGHT, J.—(dissenting). I think the statement of Dr. Harrison to the effect that he did not see that there was very much the matter with the defendant, and that he was probably faking, and the statement made by Dr. Donovan to Officer Fowler to " look out for him or he would get up and run," were, under the circumstances, improperly received, and should have been excluded ; but I am not satisfied that a new trial should be granted in consequence of the admission of these statements. Both Dr. Harrison and Dr. Donovan examined the defendant immediately after the homicide, and each was sworn as a witness upon the trial, in which they fully described his condition, and gave it as their

opinion that he was shamming unconsciousness. Dr. Donovan said that he made a thorough external examination as well as he could with the man lying upon the sidewalk; that he examined his head and body and felt of his pulse; that his pulse rate was 80 and his respiration 18 a minute; that everything about him appeared to be normal; that, being of the impression that he had shot himself, he had looked for hemorrhage, and found none; that he opened his lips, and put his fingers in his mouth, to find out if he had shot himself in the mouth, and, when he did so, defendant attempted to close his mouth upon his fingers. Dr. Harrison testified that the man's condition presented nothing abnormal, except his apparent unconsciousness. His pulse was normal, his respiration normal, the pupils of his eyes and color normal. The jury, therefore, had the benefit of the sworn testimony of the doctors, giving the details of the transaction, and a full description of the condition of the defendant, with their reasons for their conclusions as to his condition. I am unable to see how, under the circumstances, an intelligent jury could have given weight to, or been improperly influenced by the declarations. It is evident that the defendant did not regard them as seriously prejudicial to his case, for, when he had Policeman Coffey upon the stand, he showed by him that the ambulance surgeon, referring to Dr. Harrison, had told him that the defendant was shamming. It is provided that, after hearing an appeal, the court must give judgment without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties. Code Cr. Proc. § 342. In this case the defendant shot and killed Rose Alice Redgate, in one of the streets of New York, at about 6 o'clock in the evening, in the presence of numerous witnesses. This fact has not been denied. The evidence presented on behalf of the defendant was properly submitted to the jury; and, if there was ever a case in which the provisions of the Code referred to should be given force and effect, it appears to me that this is one. I am unwilling to join in the affirmance of a case of this character where the accused has not had the benefit of a fair and impartial trial; but, in cases where no reasonable doubt with reference to the guilt of the accused exists, I think we ought not to send a case back for errors which cannot and ought not to affect the result reached by the

jury.   If any public good is to be accomplished by the administra-
tion of the criminal law, punishment should follow the commis-
sion of crime with reasonable dispatch.   The legislature has given
this court broad powers with reference to the granting or refusing
of new trials ; and, while it is our duty to fully protect the rights
of the accused and see to it that no innocent person is punished,
we should not forget that there is a public interest involved, which
it is also our duty to regard.

Andrews, C. J., and O'Brien and Vann, JJ., concur.

Martin and Bartlett, JJ., read for reversal and new trial.

Haight, J,, reads for affirmance, and Gray, J., concurs.

Judgment reversed and new trial granted.