## Court of Appeals.

April 26, 1901.

## THE PEOPLE v. FRANK WENNERHOLM

(166 N. Y. 567.)

1. MURDER—EVIDENCE.

Review of evidence presented upon a trial for murder where the evidence or the question of motive was somewhat meagre, examined and found sufficient to convict.

2. SAME—TRIAL—DRAWING JURY—CODE CIV. PRO., § 1035—CODE CRIM. PRO., § 358.

The concluding clause of section 1035 Code Civ. Pro. indicates that the clause fixing time for the meeting for the selection of jurors is directory, and if for any reason the duties should not be discharged by these officers at the time designated, they can discharge the duty at any time thereafter, and where certain officers made up a list of jurors at the time required by the Code for the whole city, but four months after, upon discovery that their proceedings were irregular, again met and filed separate lists for each town, Held that by proceeding to discharge their duty upon discovering that they had failed in regard to the method, they acted properly and the jurors composing the latter list were properly selected.

3. SAME—EVIDENCE.

Statements made by defendant's brother in his presence in answer to inquiries mostly addressed to defendant himself by an officer in discharge of his duty, and the remark by such officer to the sheriff " this is our man," merely identifying defendant as the person for whom they were looking with no statement to the effect that this was the

murderer or the guilty man, where the defendant was at liberty to answer or correct such statements, are admissible upon the prosecution of the latter for murder.

(MARTIN, J., dissenting.)

APPEAL from a judgment of the supreme court, trial term, upon a verdict convicting defendant of the crime of murder in the first degree.

A. A. Pickard, for appellant.

Eleazer Green and Elton D. Warner, for respondent.

HAIGHT, J.—On the evening of September 23, 1899, Emily Adolphson was found in the bushes about twenty or thirty feet from the bridge crossing the Chautauqua outlet on Phetteplace street in the village of Falconer, Chautauqua county, N. Y. in a dying condition, by two young men who had been attracted to the place by her screams. After hearing the screams they procured a lantern, ran down on to the bridge and one called out, " Hallo, who is there, where are you? " to which a faint voice replied, " I am here." They heard a splash and then a rustling of the bushes as though some one was running away through the woods towards Goodwill's mill. They then went down to where the voice came from and found a girl lying partly in the water in a low place upon the border of the stream. They took hold of her and drew her out upon the dry land and then one ran for a doctor. The young man who remained turned her over upon her back, but she did not speak. In a few minutes the other returned with a doctor; in the meantime, however, she had died. The doctor immediately returned to his office and telephoned the authorities at Jamestown. It was then 8:40 o'clock. At the place where the body was found there were bushes and weeds trampled down and tracks in the mud. The bushes and vines were covered with blood for the space of ten or twelve feet square. Within a short time the district attorney, sheriff and chief of police of Jamestown arrived and made an examination of the

body and of the ground around about.   Her throat and hands were cut.   She was bareheaded and her hair was down.   Her coat was unbuttoned and her clothing was saturated with water, blood and mud.   A short distance on one side her hat and gloves were found.   Her body was removed to the morgue in Jamestown where a *post-mortem* examination was made. There were several scratches or marks upon the face and a number of cuts made by some sharp instrument, one of which, upon the neck, was several inches long and had severed the jugular vein.   This cut was necessarily fatal and was the cause of her death.   The vital organs were examined and found to be comparatively healthy.   She was, however, found to have been about three and one-half months advanced in pregnancy. She was of Swedish birth, twenty-seven or twenty-eight years of age, and for a year or more had been working for a Mrs. Wilson on East Fifth street in the city of Jamestown.

The defendant was a Swede by birth and was about twenty-eight years of age.   He and his brother, Gust Wennerholm, boarded at No. 305 Windsor street in the city of Jamestown, occupying a small bedroom on the third floor.   Jamestown is about two miles from Falconer, and the two places are connected by an electric railroad, upon which the cars run every fifteen minutes.   The defendant was acquainted with the decedent in her lifetime, had been seen in her company several times upon the streets in Jamestown, and on several occasions had called upon her evenings at the place where she worked. A few days before the finding of her body she called upon a doctor, advised him of her condition and asked him to give her something to relieve her of her pregnancy.   On the night of her death she left Mrs. Wilson's about a quarter before seven o'clock.   The defendant also left his room on Windsor street at about the same time, saying to his brother that he would meet him later in the evening.   At about a quarter before eight o'clock Augusta Johnson and her sister were passing the Peterson block in the village of Falconer, near the end of Phetteplace street, less than a thousand feet from

the place of the homicide.   They there saw the defendant in
company with a young woman whom they did not recog-
nize, but who wore a hat resembling the hat identified as
that of the decedent.   Augusta Johnson had been acquainted
with the defendant for about three years, saw him squarely in
the face and positively identified him, stating that there was no
question about it.   Her sister also observed them, but she had
had no previous acquaintance with the defendant.   A young
man and woman were seen upon this street at about this same
time by still another person, but they were unknown to him.
As nearly as the time can be determined, the screams were
heard about twenty minutes thereafter.   An examination of
the ground by the officers disclosed broken weeds and bushes,
and tracks leading from the place where the body was found,
out through the woods towards Goodwill's mill, by a pine tree
on Lister avenue and across a potato field to the railroad
tracks.   A short distance from the starting place and in the
line of the tracks was an old log covered with moss, with the
moss torn off at the place where it had been crossed, and on the
farther side there was a dent in the ground of the size of a man's
knee, from which it is claimed that the person who ran away
from the scene stumbled over the log and fell upon his knee.
At about the time alluded to a young man and woman were
walking along Lister avenue near the pine tree.   They had
heard the screaming, and a few minutes thereafter saw, coming
from the woods on a run, a man who, on discovering them,
halted for an instant and then proceeded on a run, in a south-
erly direction, across the potato patch in the direction of the
Erie railroad tracks and disappeared from view.   At the same
time another man, who was in the employ of the railroad com-
pany, was upon the railroad tracks picking up wood, and he
saw a man coming from the direction described on a run up to
the railroad tracks and who then turned up the tracks towards
Jamestown.   Between 9:30 and 9:45 o'clock of the same
evening the defendant with his brother Gust entered a drug
store in Jamestown and purchased some medicine for a sore

and some court or adhesive plaster. During the time they were in the drug store the defendant held his hands behind him. Soon thereafter they went into a clothing store near by and purchased a hat for the defendant. Shortly after the discovery of the body a large number of residents of the village visited the scene of the tragedy and were present at the time the officers arrived and when the body was removed to the morgue. At about two o'clock of that night the sheriff, with the chief of police and several others, went to the boarding house of the defendant and inquired for him. The proprietor opened the door and showed the chief of police up stairs to the third floor and pointed out the room occupied by the defendant and his brother. The chief went up alone, the rest remaining below. He rapped at the door, which was opened by the defendant's brother Gust. Upon entering and asking Gust if he was Frank Wennerholm, he received reply: "No, that is Frank," a person who was lying in the bed awake being indicated. He then asked the defendant where he had been, and his brother answered that he had been having a fight with a man, and in answer to the question *where* he said, " down near the railroad track at Main street." Up to this time the defendant had said nothing. The chief then stepped to the foot of the bed, where there was a lot of clothing, and felt of a pair of trousers that were wet. He asked the defendant where his razor was. The defendant replied that he " hadn't got any." His brother then said, " Yes, you have, where is it? " The defendant said he had taken it up to have it sharpened. He was then asked where he took it to, but he made no reply; subsequently he said that he had lost it when he had the fight with the man on Main street. He further said that he did not know who the man was; that he was a large man, and in answer to further questions described the place where the fight took place. He was then asked where his shirt was, and he said that it was in his trunk. It was taken out of the trunk and found to be wet under the arms and had red spots on it.

At about this time the sheriff came up to the room and the chief of police said to him, " This is the man," pointing to the defendant. They picked up the trousers, which were wet and muddy and had red spots on them. The sheriff asked the defendant for his coat and vest and the defendant pointed to them. He then asked for the shoes. They found a pair under the foot of the bed, which were wet and muddy; the stockings were in the same condition. These the defendant identified as the shoes he had worn. In the meantime the defendant had dressed. The officers took the clothing and went down stairs, accompanied by the defendant and his brother, who were then put under arrest. The deputy sheriff and another man then went up to the prisoner's room and made a further search. They found a hat that was wet and muddy, a necktie that had red stains on it, and also a hand-kerchief in one of the garments. The coat was also muddy, and the defendant explaining, stated that at the time of the fight he fell into the creek and got wet. He was subsequently examined by the doctors who made the *post-mortem* examination. His hands were found to be cut and his knee bruised. He then stated that the man he had the fight with had a knife, from which he had received the cuts, and that the man kicked him upon the knee. An examination next morning of the ground described by the defendant as the scene of the fight, disclosed no disturbance or marks indicating a combat, and the flagman at the railroad crossing testified that he was constantly on duty from six o'clock in the evening until morning; that the flaghouse was open all the time and was within a few feet of the place described by the defendant, and that he did not see or hear any disturbance or fight or any calls for help.

Early the next morning a policeman and another person went to the scene of the tragedy to make a more careful examination of the ground and one of them found the handle of a razor a few feet from the place wherethe body had been discovered. A young man boarding at the same place with the defendant had borrowed his razor to shave with. Another

had given the defendant the handle and affixed it to his razor blade. These persons upon the witness stand identified the handle found as the handle belonging to the defendant's razor. The blade was not found. Subsequently, one of the defendant's shoes was taken to the potato field and fitted into some of the footprints before referred to and was found to conform thereto.

On the defense evidence was given tending to show the decedent in her lifetime had often been seen in company with one Gus Rosenquist, who was also a Swede and who had known her in Sweden before he came to America, and who, after coming to this country, had sent her a ticket, which had been used by her in coming here. It, however, appeared that he had been keeping company with another girl also and was engaged to be married to her; that at the time of the homicide he was in Pennsylvania at work, and that a short time after the homicide he was married to the girl to whom he had been engaged. Further evidence was given on behalf of the defendant tending to show that during the pregnancy of the mother of the defendant she had a number of spasms, in which her body became rigid, and that about five months after the defendant was born similar spasms developed in him, which continued from time to time until he became about sixteen years of age. He had been in this country about eleven years and during that time had had a couple of spasms. Other evidence was given tending to show that he was subject to violent headaches and that at such times there would be hemorrhages of blood from the mouth and nose; that he was quick tempered and when angered would have a wild staring look. Medical experts gave it as their opinion that the mother had had epileptic seizures and that the defendant had inherited that disease; that these seizures were liable to occur at any time, and when under the effects of a seizure he was not mentally responsible for his acts. In rebuttal medical experts in answer to a hypothetical question covering all of the facts in the case, gave it as their opinion that he was

mentally responsible; that he knew the nature and quality of the act and knew that it was wrong.

It must be conceded that the evidence upon the question of motive is somewhat meagre. None of the witnesses had ever seen any improper conduct on the part of the defendant or of the decedent. They, as young people, had met and visited together, and he had several times called upon her at the place where she resided. Perhaps the most that can be claimed for this evidence is that it establishes an opportunity for misconduct. The fact, however, that she was pregnant existed, and this, at least, was known to her. On the night of the homicide, as we have seen, they both left their respective homes at the same hour, and an hour later they were found together in the village of Falconer, two miles distant, and within a short distance of the place of the homicide.

The testimony of the witness Augusta Johnson is of the greatest importance. If she is correct in her identification of the defendant there is scarcely room left for a doubt of the defendant's guilt. Only fifteen or twenty minutes elapsed thereafter before the screams were heard. They were then within a few hundred feet of the scene of the murder, and had the defendant been upon the streets in company with any other girl than the decedent that fact could easily have been shown. Phetteplace street was largely traveled by workmen going in the morning to the mills and returning to their homes in the evening at the close of their day's labor. At other times it was a street seldom traveled. The place where the homicide took place was in the woods near the street, where there was a path with bushes upon either side which would protect persons from view by those passing upon the highway. The time was after dark. The record does not show why they went there, but a young unmarried man and woman could hardly have sought such a place at that time of night for innocent purposes.

Upon carefully considering and weighing all of the evidence, our conclusion is that it required a submission of the

question of the defendant's guilt to the jury; and that the verdict rendered should be regarded as a final determination of the facts.

The first question of law raised for our determination has reference to the challenge to the panel of jurors that was interposed by the defendant. It appears that in 1898, by chapter 231, the legislature amended the charter of the city of Jamestown by providing that the first, second and fifth wards of the city shall be regarded as a town for the purposes specified in the Code of Civil Procedure respecting the selection, drawing and procuring the attendance of trial jurors, and that the third, fourth and sixth wards of the city shall be regarded as another town for the same purposes. By the provisions of that act the supervisor of the town so created, the clerk of the city and the assessors were required to perform the duties of making up the lists of jurors under the provisions of the Code. In discharging this duty the supervisors of the two towns met with the assessors and the city clerk and made up a list of jurors for the whole city and filed it with the county clerk. This was done at the time required by the Code. Some four months afterwards, upon discovery that their proceeding was irregular and did not conform to the statute, the supervisor of each town so created in the city met with the assessors and the city clerk, and the supervisor, assessors and city clerk of each of the towns made up a separate list of jurors, which separate lists were filed with the county clerk on the 11th day of December. The separate lists so made contained the same names that were upon the general list that had previously been made, but separated so as to make a list for each of the two towns. The lists of jurors so selected went into the general jury box of the county from which the panel of jurors that sat upon the trial in this case was drawn. The Code of Criminal Procedure provides that " The trial jury is formed as prescribed by the Code of Civil Procedure." (§ 358.) Section 1035 of the Code of Civil Procedure provides that " The supervisors, town clerk, and assessors of each town, must

meet on the first Monday of July, in the year 1878, and in each third year thereafter, at a place within the town, appointed by the supervisor; or, in case of his absence, or of a vacancy in his office, by the town clerk; for the purpose of making a list of persons, to serve as trial jurors, for the then ensuing three years. If they fail to meet, on the day specified in this section, they must meet as soon thereafter, as practicable." The concluding clause of this section clearly indicates the legislative intent that the clause fixing the time for the meeting for the selection of jurors should be regarded as directory, and if for any reason the duties should not be discharged by these officers at the time designated, they can discharge the duty at any time thereafter. It is true that these officers made an attempt to discharge their duty at the time designated by the Code, but they failed to do so; they did not follow the provisions of the statute. As soon as they discovered that they had failed in this regard, they again proceeded to discharge their duty under the statute, and we think that they succeeded in doing this by the lists that they made and filed on the 11th of December, and that the jurors composing such lists were properly selected, and that they became the jurors of the county at large from which panels of trial jurors are properly drawn.

Objection and exceptions were taken by the defendant to the admission in evidence upon the trial of the statements of the defendant's brother, Gust Wennerholm, and the chief of police at the time that the chief called at the defendant's room. We have already referred to the principal portions of this testimony. It will be remembered that the door was opened to the chief of police by the defendant's brother, and that the chief then asked if he was Frank Wennerholm; that the brother answered, "No," and said, "That is Frank," pointing to the person who was lying in the bed. The defendant was lying there awake, and was consequently in the hearing and presence of his brother. The chief then addressed the defendant, asking him where he had been. To this the

brother answered that " he had been having a fight," and stated the place.     Much other conversation took place, in which the defendant and the brother joined, answering the questions of the chief, but sufficient has been stated to present the legal proposition which we are called upon to consider.     It is claimed that this testimony was incompetent under our decision in People v. Kennedy, 164 N. Y. 449, but the testimony condemned in that case was very different from that presented in this.     In that case a number of persons had been gathered together in a room in company with Kennedy, who was under arrest, and the police brought in a colored bell boy to see if he could identify the defendant as the person to whom he had served a bottle of wine in the room where the homicide had taken place.     The policeman then gave the boy instructions as to how he should proceed, telling him of the importance of the case, that he must make no mistake and so on, thus introducing his own statements as evidence, entirely outside of the fact of identifying the person charged, and then prohibited the defendant from making any reply to what was said by the boy.     Nothing of the kind occurred in this case by which the chief of police made evidence of his own statements outside of that which legitimately bore upon the case.     The chief of police was in the discharge of his duty, properly making inquiries with reference to the defendant. The questions asked by him were proper; they were asked in the presence of the defendant and were answered by his brother in his presence, he making no correction in reference thereto; subsquently he himself stated the particulars of the fight he had had with a man at the Main street crossing of the railroad tracks, which confirmed all that the brother had said upon the subject.     The rule with reference to declarations was stated by us in the Kennedy case, and we again repeat it as taken from that case: " Declarations or statements made in the presence of a party are not received as evidence in themselves, but for the purpose of ascertaining the reply the party to be affected makes to them.     They are only competent when the person affected

hears and fully comprehends the effect of the words spoken and when he has had full liberty to make answers thereto. And then only under such circumstances as would justify the inference of assent or acquiescence as to the truth of the statements by his remaining silent." In this case, as we have seen, the statements were made by the defendant's brother in his presence in answer to inquiries, most of which were addressed to the defendant himself, when he was at liberty to make answers thereto or correct any misstatements that were made by the brother. The questions were all simple, readily comprehended, made by an officer in the discharge of his duty and we think, under the circumstances, such as would justify an inference on the part of the jurors of his assent and acquiescence as to the truth of the statements. For a time the chief of police had been alone in the room talking with the defendant and his brother and examining the defendant's clothing. Then the sheriff came in, and as he entered the room the chief remarked, " This is the man," pointing to the defendant. They then picked up the trousers and examined the other articles of clothing. When the officers went to the house they inquired for Frank Wennerholm. The proprietor took the chief of police up to the room and showed him where it was. On entering the room he inquired for Frank Wennerholm. They went there seeking Frank Wennerholm, and this evidently was what was meant by the chief of police in saying " This is the man " when he pointed to the defendant. It was merely identifying the man as the person that they were looking for, and we think it could have no other effect. There was no statement made to the effect that this was the murderer or the guilty man. Indeed, nothing had been said at that time to the effect that any murder had been committed, and we do not think the jury could have so understood the statement. Our conclusion, therefore, is that the exceptions taken to this class of evidence present no error which calls for a reversal.

We have carefully examined the other exceptions raised by the record, but we find none that calls for a reversal of the

judgment or that requires any extended discussion at this time.   The testimony .of the deputy sheriff to the effect that he had heard the testimony given by the sheriff and that he did not recall that anything had been omitted by him; the testimony of Augusta Johnson to the effect that she spoke to her sister of the defendant at the time she passed him in Falconer without stating what she said; the earth taken from the scene of the homicide for comparison with the dirt found upon the clothing of the defendant, and the testimony of the witness Stroudahl to the effect that she had not seen other young men keeping company with the decedent in her lifetime, certainly were not erroneously received and do not require any further consideration.   The defendant, having introduced evidence from which he claimed that he was subject to epileptic seizures, made it competent for the People to show by experts that he was mentally responsible by hypothetical questions that were within the evidence given upon the trial and based upon facts which the jury might have found.

The juror Harrington was properly discharged because of his conscientious scruples, and the evidence in the case is not reconcilable with the theory of suicide.

The judgment of conviction should be affirmed.

MARTIN, J. (dissenting.—Although the evidence was sufficient to present a question for the jury, still, as it was entirely circumstantial and disclosed no motive for the commission of the crime, the rulings should be carefully scrutinized to ascertain if other than proper proof was admitted to the defendant's prejudice.

The rights of the defendant were improperly invaded by proof of his declarations and what was said and done in his presence upon the night of his arrest.   Under the circumstances disclosed, his declarations cannot be regarded so far voluntary as to justify their admission.   He was surrounded by officers who were pressing him with questions on every hand, and who were demanding proof of him of various kinds,

including the presentation and delivery of different articles of clothing, and all this without the slightest suggestion or intimation that he might decline to answer or furnish the other proof which was used against him. People v. Kennedy, 159 N. Y. 346.

The prosecution was allowed to prove the declarations of officers and the statements of the defendant's brother made at a time when the defendant was not only laboring under great mental excitement and might well have failed to comprehend what was passing around him, but also when he was practically in official custody. This proof included a statement by the police officer to the sheriff. " That's the man! " Permitting the People to prove that declaration in his presence was doubtless prejudicial to the defendant. It may have been understood by the jury as an assertion that the defendant committed the crime, and consequently, in the absence of any denial by him, as a tacit admission to that effect. Possibly the statement may have been intended otherwise by the officer, and yet from the proof the jury may have understood that it was an assertion of his guilt to which he made no response. It was plainly susceptible of that construction, especially in view of the circumstances· and what was proved to have transpired at that time.

The evidence of these declarations and statements was incompetent and improper, being mere hearsay or the statements of the witness to a third person, unless made under circumstances such as would make them binding upon the defendant. The only ground upon which the admission of this evidence can be sustained is that the silence of the defendant amounted to an acquiescence in the statement made by the witness, and was, therefore, binding upon him. This is a rule which should be applied with careful discrimination. · It is only where a defendant is in a position to that he is not only afforded an opportunity to act or speak, but where the circumstances are such as would naturally and properly call for some action or reply from persons similarly situated. If the circumstances do not

naturally and properly call for such action or reply, the testimony is entirely improper. In this case it is difficult to see how it can be properly said that the defendant was required, or that he would naturally reply to the statements that were made in his presence and of which proof was given upon the trial under objection and exception. People v. Koerner, 154 N. Y. 355. The burden of showing that the admission of this evidence was harmless was not upon the appellant. It rests with the respondent to show that it was harmless and could by no possibility have prejudiced the defendant. People v. Koerner, *supra;* Greene v. White, 37 N. Y. 405, 407; Stokes v. People, 53 id. 164, 183; People v. Greenwall, 108 id. 296, 303; People v. Corey, 148 id. 476, 494; People v. Strait, 154 id. 165, 171.

I am of the opinion that many of the statements of the defendant, the declarations of his brother and the declarations and statements of the officers were improperly admitted in evidence, and constituted error for which the judgment should be reversed.

PARKER, Ch. J., O'BRIEN and LANDON, JJ., concur with HAIGHT, J., for affirmance; BARTLETT, J., concurs with MARTIN, J., for reversal; VANN, J., not voting.

Judgment of conviction affirmed.