## Court of Appeals.

Nov. 20, 1900.

## PEOPLE v. SAMUEL J. KENNEDY.

(164 N. Y. 449; 58 N. E. Rep. 652.)

1. HOMICIDE—EVIDENCE—IDENTITY.

Declarations or statements, made in the presence of a party charged with crime, are only competent when the person affected hears and fully comprehends the effect of the words spoken, and when he is at full liberty to make answer thereto, and then only under such circumstances as would justify the inference of assent or acquiescence as to the truth of the statements, by his remaining silent.

2. SAME.

A police officer was allowed to testify that he called in a bell-boy to identify the accused as being the person whom he served at the hotel; that he told him to speak to all the persons in the room; that the bell boy said there was no use in speaking, and pointed out Kennedy, the accused; that Kennedy denying that he ever saw the bell-boy, witness said, " Stop, Kennedy, you will understand this later," and that he sent for other witnesses to identify him. *Held,* that his testimony was hearsay, incompetent, and prejudicial to defendant.

APPEAL from a judgment of the supreme court, criminal term, county of New York, convicting Samuel J. Kennedy of murder in the first degree.

W. W. Cantwell and R. M. Moore, for appellant.

Charles E. Le Barbier, Asst. Dist. Atty., for the People.

HAIGHT, J.—On the morning of the 16th day of August, 1898, the dead body of Emeline C. Reynolds was found lying upon the floor in room 84 of the Grand Hotel, on Broadway, in the city of New York. The body was fully dressed, with the exception of the hat, which had been removed, and was lying in the room. By the side of the body, upon the floor,

was found a bludgeon, consisting of a lead pipe about 17 inches in length, through which an iron rod had been inserted, and wound at one end with tape. A post mortem examination of the body disclosed two wounds upon the top of the head, each about 2½ inches long, one about an inch behind the other, cutting through the scalp. The lobe of the right ear was found to be discolored, and there was a fracture of the cervical vertebra or neck. No other marks were found upon the body. It appeared to be well nourished, and in other respects in a healthy condition. The physician who conducted the autopsy gave it as his opinion that the wounds were produced by blows upon the head, and that death was due to œdema, congestion of the brain, asphyxia resulting from pressure on the spinal cord, and fracture of the cervical vertebra, and that death could have been produced from the blows of the bludgeon which was found by her side. The deceased was a young woman, unmarried, and had formerly lived at Mt. Vernon, where her parents, brothers, and sisters still reside. For the last two years she had been living at the corner of Fifty-Eighth street and Ninth avenue, in a flat on the first floor, with a New York broker, under the name of Reynolds, as man and wife. On Monday, the day preceding the finding of her body, she left her home in the morning, taking with her a small bag or reticule; and about half-past 12 o'clock she entered the Grand Hotel, went to the desk, and registered in the name of " E. Maxwell and wife, Brooklyn," and was assigned by the clerk to room 84, on the fourth floor. She was conducted to this room by a bell boy, and left there. At about 2 o'clock she entered the dining room, and was conducted to a table, at which she was served with a lunch. After finishing her lunch she signed the bill therefor with the name of " E. Maxwell, room 84." A few minutes afterwards she left the hotel by the ladies' entrance, on Thirty-First street, and did not return until about 6 o'clock in the afternoon, at which time she was accompanied by a man. They entered the hotel at the entrance from Thirty-First street, passed through the dining room, and

took the elevator to the room to which she had been assigned. They remained together in the room until about a quarter of 7, when they descended by the elevator to the office floor, and passed out through the dining room into Thirty-First street. They again returned to the hotel together about 10 minutes before 12 o'clock, passing through the dining room to the elevator, and thence to their room. · After they returned to their room a lady occupying room No. 52, which is directly under room 84, heard two persons walking about ·the room. After some time her attention was attracted by a heavy fall upon the floor in the room above, and this was followed shortly after by another fall. After that she heard the walking of one person about the room for some time, but finally fell asleep, and. observed nothing further until morning. A few minutes after 2 o'clock the man who had accompanied the deceased passed down the stairs of the hotel to the office, and thence out through the corridor into Broadway. The body of the deceased was first found by the chambermaid, who entered the room at about half-past 9 in the morning.

The evidence establishes beyond a reasonable doubt, and we understand the fact to be conceded by the defendant, that Miss Reynolds had been killed by some person under circumstances which would justify a jury in finding that the act was committed with deliberation and premeditation. We are thus brought to a consideration of the question as to whether the crime was committed by the defendant. He was a dentist, having an office at No. 60 West Twenty-Second street, in the city of New York, in company with his father, who is also a dentist. He was a married man, about 32 years of age, and resided at Newdorp, Staten Island, with his parents. At the time of the homicide his wife was absent from home on a visit. Upon disrobing the body of the deceased, in order to make an autopsy, there was found underneath the corset the sum of $8.90 in money, and the following check: " No. 1,226. New York, August 15, 1898. The Garfield National Bank, Twenty-Third street and Sixth avenue, pay to the order of Emma

Reynolds thirteen thousand dollars ($13,000). Dudley Gideon." The check bears a two-cent postage stamp canceled, and is indorsed upon the back, " S. J. Kennedy." There were also found in the room several scraps of paper, which had been torn up. Some of the pieces were found in a waste basket in the corner of the room, and some of the scraps were found by the easterly window. These scraps, when put together, formed a complete paper, on which there appears in lithograph in the upper left-hand corner a capital " R " On the left hand is a line for date, with the figures " 189 ," and underneath are the words " Phillips Milk of Magnesia, 12 oz." On the reverse side of this paper was written the words " E. Maxwell and wife, Grand Hotel." After finding the check with the defendant's name indorsed upon the back of it, the detectives detailed to investigate the case called upon the defendant at his office, showing him the check, and asked him if the signature was his. He stated that it was not, that he had never seen it before, and that he was not at the Grand Hotel the night before in company with the decedent. He was, however, subsequently placed under arrest and taken to the West Thirtieth street police station, and upon a search of his office there was found a blank check book, with a number of checks signed by him, several letters, and a pad of paper on which was printed " Phillips Milk of Magnesia, 12 oz.," conforming in every respect to the scraps found in the room of the deceased, to which we have already referred. Upon a search of the defendant's residence in Newdorp, there was found in the cellar a piece of lead pipe corresponding in size to that of which the bludgeon had been constructed, and also a piece of iron of the same size as that which had been inserted in the pipe constituting the bludgeon. The head waiter, his assistant, the bell boy, elevator boy, and the front clerk of the Grand Hotel, who saw the man with the deceased, were sworn as witnesses upon the trial, and identified the defendant as the man who occupied the room with her on the night of the homicide. As they described him, he wore a straw hat. It appears that previously he had worn

a brown derby hat, but testimony was introduced showing that on the afternoon of that day he had purchased a straw hat and a golf cap; the cap being subsequently found in his office, and identified by the salesman.    Expert witnesses were produced, who, upon comparing the check for $13,000 found upon the body of the deceased, with papers proved in the case to be written by the defendant, gave it as their opinion that the check was filled out and signed by the defendant, and that the indorsement on the back was his genuine signature.    They also gave it as their opinion that the writing upon the scraps of paper found in the room of the deceased, of the words, " E. Maxwell and wife, Grand Hotel," was also that of the defendant.    On the morning preceding the homicide, the defendant put on his wife's undershirt or wrapper.    After closing his office in the afternoon, he went to a store and purchased a new suit of underwear, consisting of a shirt and drawers, and then returned to his office and put them on.    Upon his arrest there was found upon the drawers a dark streak or mark, extending from the waistband down towards the knee, which it is claimed was made from the lead pipe or bludgeon hanging inside of his trousers and against his drawers.    After he was arrested he was asked by the police as to his whereabouts the evening before, and it is claimed that he made contradictory statements with reference thereto, and materially varied the same on subsequent occasions when questioned upon the subject.    Other circumstances of lesser importance were disclosed by the evidence, but we have specifically called attention to all that is necessary to be considered upon this review.

The evidence is of such a character as to require a submission of the case to the jury, and thus cast upon that body the responsibility of determining the question of the guilt of the accused.    We, however, have called attention to the evidence for the purpose of showing that the testimony given as to the identity of the defendant as the person who occupied the room in the hotel with the deceased on the night of her death related to the chief vital question at issue, and was of the utmost im-

portance. Bearing this fact in mind, we proceed to a consideration of the testimony of Capt. Price, of the police department. After the defendant had been arrested and taken to the police station, the captain testified that he brought in a number of other people and placed them in the room with the defendant; that he then sent for the colored bell boy at the hotel, by the name of Davis, who had served a bottle of wine to the person in room 84. On his arrival he was taken into the room where these persons were congregated, and then the captain said to him: " ' Will you look around this room carefully, and see if you can see anybody that resembles that man?' I says: ' Mr. Davis, be awful careful in your judgment.' I says: ' This is a serious matter. It may involve the life of a man, and, if you ever exercised care in your life, do it now.' He says: ' There is no use of my looking around this room.' I had told him to speak to each individual in the room. He had told me of a conversation that he had had with a man in the hotel about the wine and a corkscrew. I said: ' Speak to every individual in the room. Make no mistake as to voice. If there is any doubt at all, give it to the man you have in mind.' He says: ' Captain, there is no occasion for me to speak to anybody. There is no occasion for me to go around the room. I see the man that I served with a bottle of wine.' ' Where is he?' ' There he is, sitting right over there' (walking a few feet and pointing to Kennedy). I stopped him immediately and said: ' You have made a mistake. Ain't it that man?' (pointing to another man, the other side of the room). ' Get up and look at him. Ain't that the man?' ' No,' he said; ' there is the man that I served with the bottle of wine.' Kennedy spoke up and said: ' I never seen you in my life, before.' I said: ' Stop, Kennedy. You will understand this a little later on.' " The captain then proceeded to state that he sent for other persons in the hotel, and had them brought over to the police station to see if they could identify the defendant, and, among others, stated that Stephen Burns, a waiter at the hotel, next saw the defendant. He looked the people over as they

walked around the room, and he said that "this man, Kennedy, was the man that he had seen in the hotel." Burns was not sworn as a witness upon the trial, but Davis was; and upon the trial he identified the defendant as the person he had served with wine in room 84 on the night of the homicide, and that he went to the captain's office the next day to identify the man. He stated that he looked around the room, and noticed that Mr. Kennedy was the gentleman that he served with wine; that he caught his features at once. He also stated that the captain of the dining room was in the captain's room at the same time, and that he picked out the defendant before the witness did, but that he was positive that the defendant was the man that he saw in room 84.

We think the captain's testimony, to which we have referred, was hearsay, incompetent, and prejudicial to the defendant. He gives us, in considerable detail, the conversation that took place between himself and the colored bell boy, in which he took great pains to instruct the boy with reference to his duty, the care that he should take, and his replies thereto, all tending to show that the boy was certain as to the identity of the defendant. It is true that this conversation took place in the room in which the defendant sat, in company with a number of other persons; but, when the defendant undertook to speak and deny that he was the person, he was instantly stopped by the captain and required to keep still. There are circumstances under which the declarations of persons made in the presence of the accused are competent, but they are regarded as dangerous, and should always be received with caution, and should not be admitted unless the evidence clearly brings them within the rule. Declarations or statements made in the presence of a party are not received as evidence in themselves, but for the purpose of ascertaining the reply the party to be affected makes to them. They are only competent when the person affected hears and fully comprehends the effect of the words spoken, and when he is at full liberty to make answer thereto, and then only under such circumstances as would justify the inference of assent or

acquiescence as to the truth of the statement, by his remaining silent. Whart. Ev. §§ 1136, 1137; Greenl. Ev. §§ 197-199; People v. Koerner, 154 N. Y. 355, 374; 48 N. E. 730; Kelly v. People, 55 N. Y. 565; Gibney v. Marchay, 34 id. 301, 305; People v. Willett, 92 id. 29. The defendant, as we have seen, was not permitted to reply, but was required to keep silent. His silence, therefore, could not, under the circumstances, be construed into an acquiescence or an admission of the truth of the matters embraced in the statement. The police officer could not tell whether Davis or Burns recognized the defendant, further than by the statements made by them at the time when neither were under oath. Burns has not been sworn as a witness, and we have no means of knowing whether he did in fact identify the defendant, other than his unsworn statement made to the police. Davis, it is true, was sworn upon the trial, and to some extent corroborated the police officer as to his identifying the defendant at the police station; but his declarations made at that time in reply to the instructions given him by the officer were not evidence, and did not tend, under the circumstances, to establish an admission on the part of the defendant that he was the person who had been in the room with the deceased.

No objection was taken by the defendant's counsel to the evidence referred to, and consequently there is no exception which presents an error of law upon which a reversal of the judgment can be founded. Section 528 of the Code of Criminal Procedure, however, provides that, " when the judgment is of death, the court of appeals may order a new trial, if it be satisfied that the verdict was against the weight of evidence or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below." This provision of the Code gives to this court the power, in its discretion, to order a new trial when, in its opinion, justice requires it. This power may be properly exercised when it is apparent that the defendant has suffered gross injustice by the admission of incompetent evidence upon the main and vital

issue, even though the defendant's counsel has failed to object to its reception. The provisions of the Code, however, were not intended to relieve counsel from the duty of objecting, and, in case their objection is overruled, of taking an exception to the admission of incompetent evidence. Counsel cannot be permitted to impliedly consent to the admission of evidence by remaining silent when it is offered, and then insist that it is incompetent and that an error has been committed. No error of law is presented for review unless a question is raised by an exception. The legislature has seen fit to invest this court with the power to grant a new trial. It is a power to be exercised or withheld in its discretion. Before a judgment of death is carried into execution, this court must be satisfied that the accused has had a fair trial, and that he is guilty of the crime. If it is so satisfied, the power will not be exercised. If it is not satisfied, then it will avail itself of the power given. As we have seen, the incompetent evidence bore upon the chief, vital question at issue. It is of that character which must have had an important bearing upon the minds of the jurors, and, we fear, in a measure influenced their verdict. We think, therefore, that justice will be promoted by the granting of a new trial. The judgment and conviction should be reversed, and a new trial ordered.

PARKER, C. J., and O'BRIEN, BARTLETT, MARTIN, VANN, and LANDON, JJ., concur.

Judgment of conviction reversed, etc.