## PEOPLE *v.* COURTNEY.

1. CRIMINAL LAW—PLEADING—PLEA IN ABATEMENT—BURGLARY—AMENDMENT—INFORMATION.

No error was committed by the trial judge in a prosecution for breaking and entering a bank, in overruling respondent's plea in abatement and permitting the prosecuting attorney to amend the information so as to show that the property and bank belonged to a private individual instead of a corporation as alleged.

2. SAME—EVIDENCE—IDENTITY—SUFFICIENCY OF PROOF.

It was also proper to receive testimony of a witness tending to identify the respondent as one of three persons seen near the bank at 2 o'clock in the morning of the alleged burglary, although the witness was not positive and did not see the face of the person that he observed.

3. SAME—ADMISSIONS—ACQUIESCENCE IN STATEMENT OF ANOTHER—HEARSAY.

The court erred, however, in receiving the testimony of the sheriff that an officer of another city who arrested respondent and turned him over to the witness, had

delivered to the sheriff certain burglars' tools which he stated, in the presence of the respondent, had been found on the latter,—in the absence of further proof that respondent's attention was called to the conversation, or that he was near enough to hear it, or that the circumstances were such as to call for a response or contradiction of the statement.

4. SAME—IMPRISONMENT—ARREST—WITNESSES.

In order to warrant the admissions of testimony that such statement was made in the presence of the accused who was under arrest, it should appear that the circumstances called for a reply or denial.

5. SAME—BURGLARS' TOOLS—EVIDENCE.

Proof that the respondent had burglars' tools in his possession three years after the date of the crime of which he was accused was improperly received in the evidence.

Error to Genesee; Wisner, J. Submitted November 7, 1913. (Docket No. 148.) Decided December 20, 1913.

James Courtney was convicted of breaking and entering a store occupied as a bank. Reversed.

*Grant Fellows*, Attorney General, *James A. Greene*, Assistant Attorney General, *Clifford A. Bishop*, Prosecuting Attorney, and *James S. Parker*, for the people.

*William T. Kelly* and *Fred W. Brennan*, for respondent.

STONE, J. The respondent was convicted of a violation of section 11547, 3 Comp. Laws (5 How. Stat. [2d Ed.] § 14593), by feloniously and burglariously breaking and entering the store building known as the Bank of Mt. Morris, not adjoining to or occupied with a dwelling house, being then and there the property of Charles D. Stanley, with intent the goods and chattels of Charles D. Stanley in the said bank

then and there being found, feloniously and burglariously to steal, take, and carry away, at the village of Mt. Morris, in the county of Genesee, on the night of November 24, 1908.

Neither the complaint, warrant, nor original information alleged the ownership of the building, and alleged the ownership of the goods and chattels therein contained to be in the Bank of Mt. Morris, a banking company organized and doing business under the laws of the State of Michigan. There was a preliminary examination, and it there appeared that the bank was a private bank and was the property of Charles D. Stanley. Upon the filing of the original information, the respondent filed a plea in abatement, alleging that upon his examination there was not produced or given any legal or competent testimony tending to show that there was probable cause for charging him with being guilty of the crime set forth in the information. This plea was overruled by the trial court, whereupon the prosecuting attorney moved to amend the information by striking out the words, "did break and enter with intent the goods and chattels of the Bank of Mt. Morris, a banking company, organized and doing business under the laws of the State of Michigan," and by inserting in lieu thereof the words, "did break and enter with intent the goods and chattels of Charles D. Stanley, doing business as the Bank of Mt. Morris, a private bank." The trial court finally permitted the prosecuting attorney to file an amended information containing the change above indicated, to which respondent's counsel excepted. The respondent standing mute, a plea of not guilty was entered, and the trial proceeded. There was testimony that the bank was a private bank owned by Charles D. Stanley.

At the close of the people's testimony, counsel for respondent moved for a directed verdict in his behalf, because the ownership of the building had neither

been alleged in the information nor proven. The trial court thereupon permitted an amendment to the amended information alleging that the building was "then and there the property of Charles D. Stanley," and evidence was received tending to prove the fact; to which ruling counsel for respondent excepted. Upon the trial there was no direct evidence of the guilt of the respondent, but the people relied upon circumstantial evidence. The evidence was to the effect that on the night of November 24, 1908, the store building, known as the Bank of Mt. Morris, was entered by forcing the door of the building, and the doors of the safe or vault were forced open by the use of explosives. The door of the money vault was not forced open, but about $35 in pennies were missing. This was discovered the next morning, and there were at that time various parts of locks or combination of the safe lying about the floor, together with money, papers, and documents that had been placed in the safety deposit boxes of the bank.

On the day preceding the night upon which the bank was broken into, the respondent and one Kelly, who seem to have been strangers, were at the village of Mt. Morris. They were first seen there about 6 o'clock in the morning at the hotel in the village. They had a satchel in their possession. They took breakfast at the hotel, after which they took a room, to which they carried their satchel, and which room they occupied continuously until after 1 o'clock p. m., when they came down and asked for dinner, which was served to them. After eating their dinner, they went to the lobby of the hotel, and one of them, offering to pay their bill, presented a $20 bill to the hotel keeper. Before change was made, the other interrupted and said he had the right change, whereupon the right change was accepted, and the $20 bill was returned to the one who presented it. After paying their bill, respondent and Kelly went directly to the

Bank of Mt. Morris (being the same bank that was broken into), and respondent presented a $20 bill to the cashier and asked for change. The cashier gave in exchange one $10 bill and two $5 bills, which were accepted by respondent; but after counting the money he returned to the paying window and asked to be given ten $1 bills for the $10 bill, which request was complied with. After this the parties left the bank, returned to the hotel, but soon went away, and were not seen again, so far as this record shows, unless it can be said that they were seen by the witness Bache the following night. This witness testified that he was that night at a raffle until about 2 o'clock in the morning; that on going home he went by the bank building in question and saw three persons near the bank; that when he was on the opposite side of the street from the bank the men were about the west end of the bank; as he went toward the bank they moved toward the witness; that when he got within 12 or 15 feet of them they turned and went back west; and that he went along home. He testified as follows:

"*Q.* I will ask you to look at Mr. Courtney, the gentleman that sits between Mr. Brennan and Mr. Kelly, and tell this jury whether or not he was one of those that was there?

"*A.* Well, I could not say; of course there are lots of men the same size.

"*Q.* How was he for size?

"*A.* This man was—would weigh I should judge about 160 or 162, although I could not see the third one very close; he did not seem to come toward me.

"*Q.* What would you say in regard to the one you saw compared to the size of Mr. Courtney?

"*A.* Well—

"*Q.* Look at him now.

"*A.* I could not state for sure; he had an overcoat on.

"*Q.* What?

"*A.* They had an overcoat on, I think.

"*Q.* Did you get a chance to observe his face particularly?

"*A.* No, I did not, not close enough.

"*Q.* Did he make any effort to conceal his face from you?

"*A.* He did not.

"*Q.* Was it any person you had ever seen around Mt. Morris before that?

"*A.* I could not say; I don't think so.

"*Q.* Now, did you hear the reports that night of an explosion?

"*A.* I did.

"*Q.* How far did you live from the bank building?

"*A.* Oh, I lived probably 250 feet or 300; somewhere around there."

On cross-examination he testified as follows:

"*Q.* I understand you to say, Mr. Bache, that you could not state whether Mr. Courtney, the gentleman that sits here, was one of the men you saw that night or not?

"*A.* Well, I am not positive, as I was not close enough to identify his face."

It appeared in evidence that about three days after the burglary of the Mt. Morris Bank the United States post office at the village of New Baltimore, in the county of Macomb, was broken into and an attempt made to open the safe in said post office by means of explosives. The next day after the New Baltimore affair, the respondent and Kelly were arrested at a certain hotel in the city of Detroit, and they were turned over to the sheriff of Macomb county for trial for the offense committed in that county. At that time certain keys and other claimed burglarious tools, as well as a revolver and satchel claimed to have been found in the possession of respondent and his associate, were turned over to the officers; there being evidence that the satchel resembled the satchel seen in the possession of respondent and his associate at Mt. Morris. These articles, except the

satchel, appear in the record in the photograph marked "Exhibit B."

The respondent and his said associate were in the custody of the Macomb county authorities from November 28, 1908, until July 6, 1909, when they broke jail and escaped. In the meantime they had been tried, but the jury disagreed. Nothing more was heard of the man Kelly. About March 25, 1912, the respondent was arrested at Oakland, Cal., and upon proper requisition papers he was turned over to two officers of Macomb county, George H. Harris and John Matthews. Upon the trial of this case it appeared that the respondent was returned to Macomb county, and upon a change of venue was tried in St. Clair county in the circuit court for that county upon the Macomb county charge, and was acquitted. Whereupon he was turned over to the authorities of Genesee county, resulting in the trial we are now considering.

Upon the trial of this case the following occurred upon the examination of the witness John Matthews relative to certain burglarious tools which were turned over to the officers by the California authorities, and represented in the photograph contained in the record marked "Exhibit C:"

"*Q.* Now, after Mr. Courtney had escaped, what is the date you stated that was, the Mt. Clemens jail?

"*Respondent's Counsel:* I object to that as incompetent and immaterial.

"*The Court:* He may answer it. (Exception.)

"*A.* July 6, 1909. From that time I did not see him again until at Oakland, Cal.

"*Q.* Now at the time of the arrest of Mr. Courtney in Oakland, Cal., and at the time of your bringing him back from Oakland, Cal., to Mt. Clemens, I will ask you what implements and what possessions were turned over to you as an officer belonging to him and on him when arrested?

"*Respondent's Counsel:* I object to that as incompetent and immaterial.

"*The Court:* I overrule it. (Exception.)

"*A.* They were not turned over to me; they were turned over to Sheriff Harris in my presence. He is my superior officer. We were together when they were turned over.

"*Q.* I will ask you to show the jury what they are?

"*Respondent's Counsel:* I object to that as incompetent and immaterial.

"*The Court:* I overrule the objection. (Exception.)

"*Prosecuting Attorney:* I offer this in evidence (referring to various articles taken from satchel, Exhibit C).

"*Respondent's Counsel:* I object to it as being incompetent and immaterial.

"*Q.* What are those, Mr. Matthews?

"*A.* Those are dynamite fuses. I would say that dynamite is inside of those blackened things there. I do not know exactly what they are. They are used in setting off nitroglycerine. They could be set off by an electric current."

There was other evidence describing these articles as burglar's tools, after which Mr. Matthews was recalled and further cross-examined as follows:

"These tools, Exhibit C, were turned over to Mr. Harris at Oakland, Cal., in my presence by the chief of police or the acting chief. I do not remember who were present at the time. I could not say where Mr. Courtney was at that time. I could not say whether he was there when the stuff was turned over or not."

It appears that the court made the following remark:

"The instrument exhibited (Exhibit A) to the jury has been placed on the vault door down in the clerk's office. I think the jury will get a very much better idea of it if they see it in actual working order, and so the jurymen and the respondent and the attorneys and stenographer will step down into the clerk's office and examine the matter."

Thereupon the jury went to the clerk's office and examined the instrument shown in Exhibit A, which was the assembling of a portion of the articles de-

scribed in Exhibit C, constituting a brace and drill adjusted to the safe door in the clerk's office. After the jury returned, respondent's counsel moved the court as follows:

"Now I will ask to have all this stricken out about the tools, and all this that is in the record respecting this demonstration of the tools.

"*Prosecuting Attorney:* I would like to ask Mr. Harris a question if he is still in the room.

"*The Court:* Unless Mr. Courtney was present and made some acknowledgment of its being his property it would not be competent."

Whereupon George H. Harris, being sworn, testified:

"I reside in the city of Mt. Clemens; am sheriff of the county; was sheriff in March and April of last year. John Matthews and myself went to California after Courtney. When we arrived in California, Mr. Courtney was in jail at police headquarters. The chief of police there, the acting chief, turned Mr. Courtney over to me. * * *

"*Q.* At the time Mr. Courtney was turned over to you by the officers of Oakland, Cal., what else was turned over?

"*A.* This stuff here (indicating articles in Exhibit C).

"*Q.* Who was it turned to you by?

"*A.* The chief of police.

"*Q.* What was it turned over to you as; where was Mr. Courtney when it was turned over to you?

"*A.* He was there.

"*Q.* Right there?

"*A.* Yes, sir.

"*Q.* What was it turned over by the chief of police as?

"*A.* Burglar's tools.

"*Q.* State if the sheriff at that time in Mr. Courtney's presence stated what they were, where they were found? (Objection.)

"*The Court:* He may answer it. (Exception.)

"*A.* He stated to me he took this stuff out of Mr.

Courtney's room on his clothes. He had, I guess, about two dry goods boxes of stuff and clothes there.

"*Q.* Did Mr. Courtney make any denial of that at the time?

"*A.* Not to me.

"*Q.* Did he to anybody at that time?

"*A.* Not that I heard.

"*Q.* He was present and heard what the chief said?

"*A.* He stood there.

"*Respondent's Counsel:* In view of Mr. Harris' testimony, I renew the motion to have it all stricken out.

"*The Court:* The motion is denied. (Exception.)"

During the course of the argument of respondent's counsel to the jury, he stated as follows:

"You cannot use what was found in their possession as evidence to convict them, but simply to account for the lapse of time.

"*The Court:* That does not apply to the satchel and stuff in California. They can consider that for anything they desire.

"*Respondent's Counsel:* An exception to what the court says. In view of what the court says about California, I want to call your attention to one thing: That was four years after it is claimed this bank was burglarized in Mt. Morris."

The respondent was convicted and sentenced, and the case is here upon writ of error. There are 43 assignments of error. Some of these we shall not specifically refer to.

1. The first, second, and 29*b* assignments allege error in overruling the plea in abatement and in permitting amendments, as above indicated, to the information. In view of the fact that there was a preliminary examination in which the witness Charles D. Stanley had testified that the bank in question was his bank, and that his bank was broken into on the night of November 24, 1908, we are of opinion that the trial court did not err in overruling the plea in abatement, or in permitting the amendments. We

need only call attention to the case of *People* v. *Pichette,* 111 Mich. 461 (69 N. W. 739), where the Michigan cases are collected, to show the liberal rule applied in this State. See, also, *People* v. *Butler,* 122 Mich. 35 (80 N. W. 883). Our statute of amendments is very broad. See sections 11908 and 11922, 3 Comp. Laws (5 How. Stat. [2d Ed.] §§ 15079, 15093). In other jurisdictions it has been held that in describing real estate, in cases of arson, burglary, and malicious mischief, a more liberal rule applies than in reference to personal property, as to ownership. In *Commonwealth* v. *Williams,* 2 Cush. (Mass.) 582, the indictment charged the defendant with breaking into and entering the city hall of the city of Charlestown. It was objected that there was no averment of property in the city of Charlestown. The court said:

"But a reference to the best books of precedents in criminal pleading will fully sustain the distinction between the modes of describing real and personal property, in reference to the ownership of such property. While the latter is described as has been stated, a very general, if not universal, mode of describing the ownership of real estate, is similar to that adopted in the present case. This is peculiarly so in indictments for arson, burglary, and malicious mischief."

It was held that the indictment sufficiently alleged the ownership of the property and that it was a public building.

2. Respondent's counsel made a motion to strike out the testimony of the witness Bache, above set forth, on the ground that it was immaterial and irrelevant. This motion was denied and exception taken, and the ruling is complained of in assignment 29c, and our attention is called to *People* v. *Gotshall,* 123 Mich. 474 (82 N. W. 274). As was said in that case, we say here:

"Although this testimony of identification is very

unsatisfactory, we do not think that we can hold that there was no evidence for the jury to act upon. The verdict, however, based upon this testimony, leads to a careful examination of the errors assigned."

3. One of the most important questions raised in the case by the assignments of error is whether the court erred in receiving the testimony of the witness Harris, above quoted, repeating the statement. made to the witness by the chief of police at Oakland, Cal., relating to the possession of the burglarious tools and instruments by the respondent at the time of his arrest in California.

It is not claimed that the conversation was addressed to the respondent, or that he said anything; neither is it clear that respondent heard it. The most that can be said upon the last point is that in answer to a leading question by the prosecuting attorney, i. e., "Q. He was present and heard what the chief said?" Harris answered, "He stood there." Whether respondent's attention was called to the conversation does not appear. It is significant that the witness Matthews, who was also present, was unable to testify whether the respondent was present or not.

Mr. Greenleaf, in his work on Evidence (vol. 1, § 197), says:

"Admissions may also be implied from the acquiescence of the party. But acquiescence, to have the effect of an admission, must exhibit some act of the mind, and amount to voluntary demeanor or conduct of the party. And whether it is acquiescence in the conduct or in the language of others, it must plainly appear that such conduct was fully known, or the language fully understood by the party, before any inference can be drawn from his passiveness or silence. The circumstances, too, must be not only such as afforded him an opportunity to act or to speak, but such also as would properly and naturally call for some action or reply, from men similarly situated." Many cases are cited.

A somewhat similar question was before this court in the case of *People* v. *O'Brien,* 68 Mich. 468 (36 N. W. 225). There it was said:

"I do not think the statement made by O'Brien, Sr., was admissible against the respondent.

"The admissions or declarations of an accused party, when voluntarily made, are competent; but the statements of another are purely hearsay, unless made under such circumstances, in the presence and hearing of the accused, that his acquiescence in such statements can be plainly inferred from his demeanor or conduct."

After quoting from Greenleaf, this court said:

"The record states that this remark of the father was made in the presence of the respondent, but there is nothing to show that he heard it, or paid any attention to it. There are no circumstances shown that lead to any inference that he heard and understood it, except that four men were in the same field or lot, picking squash bugs. It is not probable that any two of them were picking bugs from the same hill of vines, and, for all that the record discloses, the respondent might have been so far away, or of such defective hearing, that the remark did not reach him."

Here the witness Harris says of the respondent that "he stood there." Where, he does not say. How far from where this conversation was carried on, or whether he was otherwise engaged, he does not state. Yet upon the strength of this testimony the trial court permitted the introduction in evidence of what is shown in Exhibit C.

Prof. Wigmore, in volume 2 of his work on Evidence, § 1072, at page 1258, says:

"So, too, if the party had plainly no motive for responding, his silence permits no inference; and this is often the case where the statement is addressed to another person, and not to the party himself. Much more is the silence without significance when a positive deterrent motive, such as fear, was operating upon the party. Certain situations in particular may

furnish a positive motive for silence without regard to the truth or falsity of the statement. Whether the fact that the party is at the time under arrest creates such a situation has been the subject of opposing opinions; a few courts (for the most part in acceptance of an early Massachusetts precedent), by a rule of thumb exclude the statement invariably; but the better rule would seem to allow some flexibility according to circumstances."

In other jurisdictions there are many cases upon the subject. A leading case is that of *Merriweather* v. *Commonwealth*, 118 Ky. 870 (82 S. W. 592, 4 Am. & Eng. Ann Cas. 1039). There it was held that to admit in evidence in a criminal case, as an implied confession of guilt, undenied inculpatory statements uttered in the presence of the accused when he was under arrest, and when it appears that he did not, and did not intend to, commit himself on the subject, is reversible error. In a lengthy note to this case more than 100 cases are cited. Some of the States hold that statements made while the accused is under arrest are inadmissible. But we think the great weight of authority is to the effect that the mere fact that the accused is in custody will not of itself exclude the statement, if the circumstances otherwise properly call for a reply or denial.

In *People* v. *Smith*, 172 N. Y. 210 (64 N. E. 814), Judge Martin, speaking for the court, said:

"The only possible ground upon which the silence of a party can be admitted as evidence against him is that it amounts to an acquiescence in a statement or act of another person. The rule admitting such evidence is to be applied with careful discrimination. Such evidence is most dangerous and should be received with great caution, and not admitted unless of statements or acts which naturally call for contradiction, or unless it consists of some assertion with respect to his rights in which, by silence, the party plainly acquiesces. To have that effect, his acquiescence must be exhibited by some act of voluntary de-

meanor or conduct. If the claimed acquiescence is in the conduct or language of another, it must plainly appear that such conduct or language was fully known and fully understood by the party before any inference" against him "can be drawn from his passiveness or silence. The circumstances must not only be such as to afford him an opportunity to act or speak, but such as would ordinarily and naturally call for some action or reply from persons similarly situated."

It was held in *Commonwealth* v. *Walker*, 13 Allen (Mass.), 570, that one who is held in custody on the charge of crime and confined to a cell in the lockup is not called upon to contradict statements, tending to implicate him in the crime, in his hearing by another person to an officer of the law; and such statements, though heard and not contradicted by him, are not admissible in evidence against him. The court said:

"The defendant was not bound to deny or reply to the statements made between them, and his silence under such circumstances warranted no inference against him. *Commonwealth* v. *Kenny*, 12 Metc. [Mass.] 235 [46 Am. Dec. 672], states fully the rule of law applicable to such a case, and applies it to a state of facts almost precisely identical with those disclosed in these exceptions, which must be sustained."

In *Fry* v. *Stowers*, 92 Va. 13 (22 S. E. 500), it is held that declarations of a mere stranger to a controversy, having no interest in the matter, though made in the presence of the party, but not addressed to him, and to which no reply is required or made, cannot be given in evidence as an admission of such party. Mr. Greenleaf says, in discussing this subject:

"But, in regard to admissions inferred from acquiescence in the verbal statements of others, the maxim *qui tacet consentire videtur*, is to be applied with careful discrimination. 'Nothing can be more dangerous than this kind of evidence. It should al-

ways be received with caution; and never ought to be received at all, unless the evidence is of direct declarations of that kind which naturally calls for contradiction; some assertion made to the party with respect to his right, which, by his silence, he acquiesces in.' A distinction has accordingly been taken between declarations made by a party interested and a stranger; and it has been held that, while what one party declares to the other, without contradiction, is admissible evidence, what is said by a third person may not be so. It may be impertinent, and best rebuked by silence; but if it receives a reply, the reply is evidence." 1 Greenleaf on Evidence, § 199.

See, also, *Larry* v. *Sherburne*, 2 Allen (Mass.), 34; *People* v. *Kennedy*, 164 N.Y. 449 (58 N. E. 652) ; *State* v. *Mullins*, 101 Mo. 514 (14 S. W. 625) ; *Kelley* v. *People*, 55 N. Y. 565 (14 Am. Rep. 342) ; *Commonwealth* v. *Trefethen*, 157 Mass. 180 (31 N. E. 961, 24 L. R. A. 235).

In 2 Wharton's Criminal Evidence, § 679, that author, in speaking of the subject of silence as admission, says:

"The ground of admission of such statements is expressed by the courts in varying phraseology, such as, the omission to controvert the statement affords an inference of its truth; silence under the accusation is regarded as an acquiescence in its truth and an implied admission of guilt; it is not admitted because the statement was made, but because the accused impliedly ratified it and adopted it as his own statement. Such accusations are admissible in evidence, not as evidence of the truth of the accusation, but to show that it calls for a reply, and to show the acquiescence of the accused"—citing *Davis* v. *State*, 131 Ala. 10 (31 South. 569), and many other cases.

We are of opinion that the trial court erred in admitting the testimony of the witness Harris, and in permitting the tools and instruments shown in Exhibit C to be exhibited to the jury, and that the same was prejudicial and reversible error.

4. Had it appeared by competent evidence that the tools and instruments shown in Exhibit C were found in the possession of the respondent when he was rearrested in California, which fact might have been shown as a part of the *res gestæ* of the rearrest, still, in our opinion, it would have been error to permit the jury to consider them as tending to show the respondent guilty of the offense charged.

It should be remembered that the offense charged was committed on November 24, 1908. The rearrest was on March 25, 1912, three years and four months after the burglary was committed for which respondent was being tried. It further appears that all of the tools and implements found in the possession of respondent and his comrade when they were arrested in Detroit, a few days after the burglary, were already in evidence in the case, and we think properly so. We think that the correct rule is stated in 6 Cyc. at page 239, as follows:

"After preliminary proof of a burglary, it is competent for the State to prove that the defendant was found in the possession of burglarious tools or implements shortly after the alleged burglary, and to introduce the tools or implements in evidence."

*State* v. *Campbell*, 7 N. D. 58 (72 N. W. 935). Like the possession of stolen goods, the possession must be recent, or soon after the commission of the offense. It is proper to prove the possession by the prisoner at the time of his arrest, shortly after the commission of the crime, of a set of burglar tools, in order to show his intent in entering the building. It is just as competent as the possession of the stolen property. *State* v. *Franks*, 64 Iowa, 39 (19 N. W. 832).

In *Commonwealth* v. *Brown*, 121 Mass. 69, it is said that the object and purpose of the introduction of burglarious tools upon the trial of a defendant for burglary is that they tend to show that the defendant

had at the time of the offense the means and opportunity to commit the crime charged. In 3 Bishop's New Criminal Procedure, at section 151, that author says:

"Assuming the *corpus delicti* to have been proved, burglar's tools found on the defendant's person, in his dwelling, or otherwise in his possession, may, to connect him with the offense, be produced, with a showing of the attendant circumstances."

Section 152. The same rule is stated with regard to stolen goods.

Tools with which the burglary is supposed to have been committed may be exhibited to the jury. *People v. Larned,* 7 N. Y. 445; *People v. Winters,* 29 Cal. 658; *People v. Hope,* 62 Cal. 291; *Cornwall v. State,* 91 Ga. 277 (18 S. E. 154); *State v. Harrold,* 38 Mo. 496. In *People v. Winters, supra,* it was held that burglarious tools, found in the possession of the defendant, soon after the commission of the offense, may be offered in evidence by the prosecution, whenever they constitute a link in the chain of circumstances which tend to connect the defendant with the particular burglary charged in the indictment.

The use made of the tools (Exhibit C) was, in our opinion, very damaging to the respondent. The trial court stated during the argument of respondent's counsel before the jury that they (the jury) could consider the "satchel and stuff" in California, "for anything they desire." Just what was meant by this remark we do not know, but it was certainly broad enough to permit the jury to consider the possession of such tools by respondent in California, as evidence of a burglary committed nearly 3½ years before. We think this was reversible error.

We have examined the other assignments of error, but find no other reversible error in the record.

For the errors pointed out, the judgment of the circuit court is reversed, and a new trial granted. The respondent will be remanded to the sheriff of Genesee county to be dealt with according to law.

STEERE, C. J., and MOORE, MCALVAY, BROOKE, KUHN, OSTRANDER, and BIRD, JJ., concurred.