PEOPLE *v.* FOSTER.

1. HOMICIDE—APPEAL AND ERROR—FAILURE TO PUT IN AVAILABLE DEFENSE.

   In a prosecution for murder the failure to put in an available defense, on the theory that the weakness of the prosecution renders it unnecessary, cannot, in the field of facts, be in itself recognized as a ground of relief against an adverse judgment.

2. SAME—EVIDENCE—CONFESSIONS.

   Testimony by a police officer as to the voluntary admissions made by one of two defendants to him in the presence of the other defendant, *held*, admissible.

3. SAME—VOLUNTARY CONFESSIONS—ADMISSIBILITY—DURESS.

   A statement by the officer to the accused that he "better make sure of it and tell the truth," where no attending threats, promises, trickery, duress, or inducements are shown, did not render the confession made in response thereto inadmissible.

4. SAME—EVIDENCE—HEARSAY—IDENTIFICATION OF ACCUSED BY WOUNDED PERSON.

   The statements and declarations of the person injured, made in the presence of the accused, which charged him directly with the crime, or which were in any way relevant to his guilt, which he failed to deny, are competent evidence against him.

Error to recorder's court of Detroit; Jeffries (Edward J.), J. Submitted June 17, 1920. (Docket No. 88.) Decided September 30, 1920. Rehearing denied December 21, 1920.

Charles Foster and William Burns were convicted of murder in the first degree and sentenced to imprisonment for life in the State prison at Jackson. Affirmed.

*Edward J. McCarthy,* for appellants.

*Alex. J. Groesbeck,* Attorney General, *Matthew H. Bishop,* Prosecuting Attorney, *Van H. Ring* and *Allen W. Kent,* Assistants Prosecuting Attorney, for the people.

STEERE, J.   Defendants were convicted by the verdict of a jury in the recorder's court of the city of Detroit of the crime of murder in the first degree. They were charged in the information filed against them with feloniously killing and murdering by shooting one Leo Ciesielski on December 31, 1919.   Ciesielski was a fireman serving in the Detroit fire department.   On the morning of December 31st he left his fire station on leave of absence for the day.   He was found late that evening in the vicinity of Grand River avenue and Detroit Terminal Railroad in the western part of the city, as is claimed by the prosecution, seriously wounded.   He was delivered at the city receiving hospital about midnight suffering from two bullet wounds, one in the left side of the neck and the other deeply penetrating his body.   There appearing "evidence of perforation of some abdominal viscus" he was soon operated upon by the doctor in charge who found that the bullet in his body had perforated the lower lobe of his left lung and stomach.   This caused his death, which occurred on the night of January 15, 1920.

The morning after he was taken to the hospital, detectives of the police department and so-called "homicide squad" were furnished with a description of the parties claimed to have assaulted him, and two officers of the detective force were put upon the case. The description of Ciesielski's assailants then furnished the officers, as testified to by one of them named Lockwood, was, "of two colored men—22 and 35 years old—one wore an army overcoat," which he

stated, however, on cross-examination "was not all the description," but what further clues, if any, they then had does not appear.

On January 2d these two defendants were in a group of recently arrested prisoners brought to the central police station, also called "police headquarters," where they were collected together in what the officers called the "bull pen" in the station basement. It is explained in the brief of defendants' counsel to be a custom of the police department to bring prisoners in from the precinct stations where first locked up to this "pen" in the central station "for inspection, examination, etc., and to aid the detectives in working up their cases." An officer named Heig, who had a description of the men wanted in this case, called attention to these two men, who had been picked up on other charges, as resembling the description. Lockwood and other of the officers then went down and looked at the prisoners. After communicating with the physician in charge as to his condition they took defendants in company with another colored prisoner before Ciesielski at the hospital, to ascertain if he could recognize them. The men were lined up before his bed and he pointed out the two defendants, saying emphatically, as Lockwood testified, "There is the two men that done it, that shot me; don't let them get away." Asked about the other man and if he was sure, he repeated it was defendants "positively." As told by Officer Price, "he raised himself up on his elbow and pointing at Burns and Foster, he said, "Hold those men; those are the two men that held me up and shot me."

After full and positive identification by Ciesielski the men were returned to confinement and separately interviewed by Lockwood. Burns, the younger of the two, admitted they were the two men, related circumstances of the transaction, told where he met Foster,

who had a gun, that they went out on a Grand River car, described the locality of the hold-up which he admitted he was in but insisted he had no gun and Foster was the one who did the shooting. Burns was then taken before Foster and in his presence "told about the shooting." Burns was taken to the prosecuting attorney's office where his statement was taken in writing. Foster denied that Ciesielski had identified him as the man who did the shooting, and refused to make any statement. On January 3d, the men were again taken to the hospital owing to Foster's denial of Ciesielski's identifying him as the one who did the shooting, where he again identified them and said, "They are the men that shot me," and being asked which man, he pointed to Foster and said, "That is the man that shot me."

Upon the trial defendants were represented by two competent counsel, apparently as familiar with the case and at least as well prepared for trial as the attorney conducting the prosecution who, in reply to an objection made and sustained by the trial judge on his own motion to an answer by a witness who he stated "roams all over the field," made the somewhat striking explanation (as applied to a murder case): "I never talked to the witness. I never knew of this case until we started to try it."

The defense was content to rest on cross-examination of the people's witnesses, conducted at times by the presiding judge, objections against and motions to strike out testimony. Burns' written statement, or "confession" as it was called, appears, though somewhat hazily, to have been proven and introduced, or at least offered, in evidence as a motion was made by defendants to "exclude it," which was overruled at the time but the question inferentially held open for testimony as to whether or not it was voluntarily made. The only testimony which followed touching

the subject was further cross-examination of Lockwood by court and counsel as to the circumstances under which Burns' statements were made. The written statement does not appear to have been finally admitted or read before the jury and before the conclusion of the case the court said: "The statement at the prosecuting attorney's office and all statements made by Burns to this Lockwood will be excluded."

After counsel for the defense announced they would put in no testimony and both parties rested the court said to counsel:

"Now then, gentlemen, leave these confessions alone, both of you. I will instruct the jury, so far as the confessions are concerned or anything said in relation to them, they shall obliterate it from their minds."

The court did so instruct the jury.

Defendants' counsel did not then request a directed verdict of not guilty but claimed that in any aspect of the case there was no competent proof of attempted robbery, or malice, and requested the court to instruct the jury there could be no conviction of murder in the first degree. This was refused and the case submitted to the jury on a very full and fair charge, defining each of the offenses covered by the information, burden of proof, reasonable doubt, the duty of the jury in determining the issue, etc.

Defendants subsequently made a motion for a new trial on various grounds, particularly insisting upon the prejudicial effect of incompetent testimony as to deceased's statements, given in the presence of the accused, against them, and urging that admission of statements made by Burns to Lockwood, though afterwards stricken out and the jury instructed to disregard them, was a prejudicial error which the subsequent ruling and instruction could not cure as the verdict showed; that relying upon its elimination and the total insufficiency of the people's evidence with-

out it to make a case warranting conviction, though intending at the outset to introduce "strong evidence of their innocence," defendants' counsel were thus misled into offering no testimony since "it seemed unjustifiable to take up the time of the court with unnecessary rebuttal."

Upon the last proposition we are not entirely convinced that counsel did not exercise good judgment in not calling defendants as witnesses, as is stated was at first proposed, in view of the very frank statement of a deterring influence appearing later in the brief to the effect that "Foster was unfortunate enough to have a criminal record, and the defendant Burns was a young and somewhat stupid fellow who, notwithstanding his probable innocence, might perhaps have been made to appear very unfavorable before the jury." But the failure to put in an available defense on the theory that the weakness of the prosecution renders it unnecessary can not, in the field of facts, be in itself recognized as a ground of relief against an adverse judgment.

That the testimony as to admissions by Burns, if erroneously admitted, though subsequently stricken out, was presumably prejudicial in its effect on the minds of the jury and materially affected the result is a more meritorious subject. As bearing upon that contention the door seems open to the rather unusual inquiry as to whether the trial court ruled erroneously against the prosecution, for if the testimony was admissible there could be no prejudice in the jury considering it. The contents of the written confession, which was ruled out, did not get to the jury and is not in the record. What Burns told to Lockwood and repeated in the presence of Foster and others is before us and a proper subject of inquiry. What he was originally arrested for does not appear, but when he made those statements he knew that he was under

arrest and accused of participation with Foster in a holdup in which Ciesielski was shot, and that the latter had just positively identified them as the men who held him up and shot him. If it was a fact that he was in the affair, as his accuser who recognized him had asserted, but had no gun and took no part in the shooting as he stated, it was not an unnatural thing for him to form his own conclusion that the best thing for him to do was to tell the truth about it.

There is no proof or claim that any artifice or duress was resorted to or promise or threat made to him except as the court construed the language of Lockwood who had just seen him identified by the wounded man, and after his return to the central station told him "he better make sure of it and tell the truth." The presiding judge concluded a somewhat grilling cross-examination of this witness on that subject as follows:

"What did you mean by 'you better tell the truth?'

"A. Tell the truth about this affair, whether he was out there or not.

"Q. What did you mean that he better do it, it would be better for him?

"A. No, I did not say that.

"Q. What did you mean by saying it would be better for him to tell the truth?

"A. Just an expression I used.

"Q. Is that all you had in mind when you said you better tell the truth? What did you mean by that?

"A. Just a way I had of expressing it, your honor.

"Q. You did not mean anything else?

"A. No, sir.

"Q. But you did say he better tell the truth?

"A. Yes, sir.

"*The Court:* Well, I think that comes within the rule, doesn't it?

"*Mr. W.:* Decidedly it does.

"*Mr. K.:* Where has it been so ruled?

"*The Court:* Well, 'better to tell the truth,' it would be better for him.

*"Mr. K.:* He did not say that.

*"The Court:* That is what he said. What is the inference? You have my sympathy, Mr. K., my profound sympathy."

It is difficult to conclude that the language actually used was in effect a threat or promise leading Burns to believe it was for his interest to make a confession, regardless of its truth or falsity, which is said in *People* v. *Dunnigan,* 163 Mich. 349 (31 L. R. A. [N. S.] 940), to be the true reason of the rule for excluding involuntary confessions.

In *People* v. *Prestidge,* 182 Mich. 80, where the repeated statement, by an officer to a prisoner charged with rape that he "had better tell the truth about it" is somewhat stressed in connection with certain other conduct clearly duress, there were three officers pressing the prisoner with questions for over three hours and the one who told him he had better tell the truth also told him in that connection that "he was lying" when he denied his guilt. To insist an accused is lying when he denies his guilt and had better tell the truth, is palpably to declare him guilty and a liar, if he tells anything else. An examination of that case shows the conduct of the officers and situation there generally are so entirely different from the instant case that the similarity of expression by the officer as there used is of little significance here. We are neither referred to nor find any case where it is held that the bare advice given by an officer to a prisoner that "you better tell the truth," where no attending threats, promises, trickery, duress or inducements are shown, is held to preclude a reply because its effect is to impel a confession regardless of its truth or falsity. Phrases and sentences in an opinion applied to the facts in special cases are often appropriate in the connection used, where they are not in the abstract a rule of general application. This court has often cited and re-

affirmed as containing the true rule *People* v. *Barker*, 60 Mich. 277, 295. It is there said:

"The presumption is that confessions have been freely made until the contrary appears: 1 Chit. Crim. Law, 571; *Williams' Case*, 1 City Hall Rec. 149; Roscoe Crim. Ev. 43; *Com.* v. *Culver*, 126 Mass. 464.

"The practice to be pursued in the introduction of confessions in evidence has not always been uniform. In Phillips on Evidence it is said:

" 'For the purpose of introducing a confession in evidence, it is unnecessary, in general, to do more than negative any promise or inducement held out by the person to whom the confession was made:' I Phil. Ev. 551.

"Mr. Chitty, in his work on Criminal Law, at page 572, says:

" 'The practice, however, at present, is for the prosecutor's counsel, on his examination of his own evidence in chief, to inquire of the witnesses all the facts, so as to satisfy the jury that the confession was voluntarily made and duly taken.'

"The question of the admissibility of the evidence is for the court, and not the jury, and is the subject of a preliminary inquiry: 1 Phil. Ev. 543; 1 Greenl. Ev. § 219.

"Unless it appears from the testimony of the witness, or other evidence in the case, that the confession was not voluntary, or was made through the influence of fear or hope; or unless the evidence offered is objected to upon the ground that the confessions were made in consequence of fear, or of favors held out to the prisoners,—no preliminary examination into the facts and circumstances is called for."

*Vide*, also, *People* v. *Owen*, 154 Mich. 571 (21 L. R. A. [N. S.] 520).

The trial court erroneously struck out this testimony, and its lingering influence on the minds of the jury, if such was the case, involved no prejudicial error.

It is further urged for defendants that testimony as to what was said by Ciesielski when defendants

were taken before him for identification was incompetent as hearsay evidence, not being an *ante mortem* statement put in legal form, or dying declaration, and proof of silence of the accused on that occasion was not competent because they were in custody, not expected to reply nor called upon to contradict such charge. Though mortally wounded, as eventuated, Ciesielski did not die until nearly two weeks later and no further statement by him is shown to have been procured. What he said on that occasion was manifestly not a dying declaration. Its claimed admissibility was to show the conduct and demeanor of defendants when identified and charged by deceased with the assault committed upon him. Defendants' counsel cite numerous authorities from other jurisdictions holding that proof of accusing statements made in the presence of an accused while in custody are inadmissible, and cite the case of *People* v. *Courtney,* 178 Mich. 137, as substantiating their contention. We do not so understand it, neither are we cited to any case where this court has so held. The authorities upon that question in other jurisdictions are not harmonious, which is noted in the *Courtney Case* as follows:

"Some of the States hold that statements made while the accused is under arrest are inadmissible, but we think the great weight of authority is to the effect that the mere fact that the accused is in custody, will not of itself exclude the statement, if the circumstances otherwise properly call for a reply or denial."

In the *Courtney Case* the defendant was charged with a burglary committed in Mt. Morris, Michigan, on November 24, 1908, and finally arrested by an officer in Oakland, California, on March 25, 1912. The Michigan sheriff who went to California after him was permitted to testify that the officer from whom he received the prisoner delivered also some burglar

tools, stating in the presence of the prisoner they had been found on the latter. It was not shown that the conversation was addressed to the prisoner, that he said anything or that he heard it. The court held the admission of this evidence of possession so long after the alleged burglary was too remote, citing authority. Such being the case, what the prisoner did or said about the tools when turned over to the sheriff would seem to be immaterial, and what is said in reference to his silence not essential to a decision of the case. The court said in concluding the opinion:

"The trial court stated during the argument of respondent's counsel before the jury that they (the jury) could consider the 'satchel and stuff' in California, 'for anything they desire.' Just what was meant by this remark we do not know, but it was certainly broad enough to permit the jury to consider the possession of such tools by respondent in California, as evidence of a burglary committed nearly 3½ years before. We think this was reversible error."

In *People* v. *Flynn*, 96 Mich. 276, proof was admitted of statements made by the person assaulted to the sheriff in the presence of the accused. Of this it was said:

"The statements of Lizzie in the presence of Flynn were admissible, in connection with Flynn's failure to deny them. She stated the fact of the intercourse, which he had already admitted. She gave as a reason that she feared him because of his threats, which he did not deny. This failure to deny the charge of threats was a matter for the jury."

Many authorities are cited from other jurisdictions in 12 Cyc. p. 431, well sustaining the following proposition:

"The statements and declarations of the persons injured made in the presence of the accused, which charge him directly with the crime, or which are in any way relevant to his guilt, which he failed to deny, are competent evidence against him."

In *State* v. *Hamilton*, 27 La. Ann. 400, it is held that the declarations of a person injured identifying the accused when brought into his presence under arrest and hand-cuffed is competent.

It has also been held that such testimony is competent, although the accused did not remain silent. In *State* v. *Nash*, 10 Iowa, 81, is found a somewhat similar state of facts to that presented here, except that the accused denied his identity. One Harrison was shot on the 2d of April and on the 4th one Nash was brought into his presence in company with others, to ascertain whether Harrison could recognize the person who shot him. Harrison pointed out Nash and said to him that he was the man. Nash answered that Harrison was mistaken and Harrison replied that he was not mistaken. The court there said:

"We know of no rule or principle which forbids such evidence going to the jury. It is admissible, leaving its weight to them. The practice is common of showing what the accused said or did, or what manifestation of feeling or passion he exhibited when arrested or when charged with crime. The weight of such proof may be slight but this is left to the judgment of the jury; we have to do with its admissibility only."

That decision is cited and followed in *State* v. *Dillon*, 74 Iowa, 653 (38 N. W. 525).

We conclude in this case that what occurred at the time defendants were taken before the deceased for identification was admissible, its weight, whether slight or great, being for the jury and properly left to their judgment. For the foregoing reasons and after an examination of the entire cause we are not of the opinion that it affirmatively appears that the assigned errors complained of have resulted in a miscarriage of justice.

The judgment will therefore stand affirmed.

MOORE, C. J., and BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.